# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-019

Filing Date: January 8, 2021

No. S-1-SC-36121

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CHRISTOPHER BERT GARCIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cristina T. Jaramillo, District Judge**

Released for Publication June 29, 2021.

Justine Fox-Young, P.C.
Justine C. Fox-Young
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
John J. Woykovsky, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Justice.**

{1}    Fourteen-month-old Isaac Arevalos (Isaac) died as a result of injuries he suffered while in the care of Defendant Christopher Garcia and Defendant's wife. The State charged Defendant with two counts of intentional child abuse resulting in the death of a child under twelve, including numerous alternatives and lesser included offenses. At trial, the State proposed two theories of child abuse. First, the State alleged that Defendant inflicted the injuries on Isaac or permitted his wife to do so. Second, the State advanced a theory of medical neglect, alleging that Isaac died as a result of Defendant's decision not to call 9-1-1 after Isaac was injured.

**{2}** The jury found Defendant not guilty of inflicting the injuries or permitting them to be inflicted, but found him guilty of child abuse under a theory of medical neglect. Reviewing Defendant's conviction on direct appeal, we hold that the evidence was insufficient to prove beyond a reasonable doubt that the delay in medical care caused Isaac's death. Defendant was additionally convicted of conspiracy to commit child abuse. Considering the evidence presented, we hold that it was insufficient to prove that Defendant and his wife agreed to commit child abuse against Isaac.

**{3}** Isaac's death was undeniably tragic. There is no question that Isaac's injuries were severe and resulted in his death. Yet, the jury acquitted Defendant of inflicting those injuries or permitting another to inflict those injuries on Isaac. And despite the severity of Isaac's injuries, we hold the State failed to present sufficient evidence to prove that Defendant caused Isaac's death by medical neglect or that Defendant and his wife agreed to abuse Isaac. We are reminded in this case of our responsibility to ensure that convictions are supported by the evidence and not merely by speculation or conjecture. *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. Accordingly, we reverse Defendant's convictions and dismiss the charges in order to avoid a double jeopardy violation. *State v. Consaul*, 2014-NMSC-030, ¶ 41, 332 P.3d 850; *see also State v. Luna*, 2018-NMCA-025, ¶ 27, 458 P.3d 457 (citing *State v. Dowling*, 2011-NMSC-016, ¶ 18, 150 N.M. 110, 257 P.3d 930 (holding that retrial is barred by double jeopardy if the court concludes that there was insufficient evidence at trial to support a conviction)).

## I.      BACKGROUND

**{4}** Defendant was tried before a jury on two counts of child abuse resulting in death and one count of conspiracy to commit child abuse in connection with Isaac's death in March 2015. The following testimony was presented at Defendant's trial.

**{5}** Isaac was the son of Carmina Vargas (Vargas) and Ramon Arevalos (Arevalos). Defendant and his wife, Lizy Portillo (Portillo), would babysit Isaac several times a week, with Isaac sometimes spending the night. On Saturday, March 21, Vargas asked Defendant and Portillo to watch Isaac while she and Arevalos worked on fixing up a mobile home that they planned on living in together. The next evening, Defendant and Portillo brought Isaac over to the mobile home for a visit. At trial, Vargas recalled that Isaac seemed "normal" and "happy" and had no visible marks on his body, and Arevalos described Isaac as "healthy" and "smiling." Over the next two days, Vargas and Portillo arranged multiple times to have Isaac returned, but Defendant and Portillo never did so.

**{6}** At 4:36 a.m. on Wednesday, March 25, Vargas received a panicked call from Defendant saying that Isaac had fallen off the bed and hit the nightstand. Defendant told Vargas that he could not keep Isaac awake and that he would bring Isaac to her, but Vargas decided to go and get Isaac herself. Vargas testified that she saw Defendant driving fast with his hazard lights on and flagged him down. She recalled:

> He opened the door and he starting unbuckling [Isaac] from the car seat. And he just handed me [Isaac] through the window, and that's when I felt

. . . that he wasn't right. And all he kept telling me was, "He's lifeless, he's lifeless, and I don't know what to do." . . . And when I looked back, he said, "Just don't tell the cops that we had the baby, because if you tell the cops, they're going to call [Children, Youth, and Families Department] on you." And he got in his truck, and he just left me there.

Vargas then drove Isaac to Arevelos's house, roughly two minutes away. She testified that Isaac's breathing was slow and "hollow" and that he was "[g]asping for air." At the house, Vargas gave Isaac to Arevalos and called 9-1-1. Arevalos testified that Isaac "had a couple bumps on his forehead [and] cheeks" and "looked . . . palish, purplish, like he wasn't breathing." Arevalos and his mother each performed CPR on Isaac.

**{7}** According to the testimony of paramedic Joseph Drevenak, paramedics were dispatched at 4:52 a.m. and took roughly six minutes to arrive at the Arevalos home. When they arrived, Isaac displayed "decorticate posturing" and a clenched jaw, both indicative of a head injury. Drevenak noticed that Isaac had bruising on his chest, arms, and legs and had "blood around his nose and mouth." Isaac was breathing at a rate of about two breaths per minute, lower than the twenty-five to thirty breaths per minute normal for a child Isaac's age. Paramedics used a "bag valve mask" on Isaac to "force breaths into him" and provided him with supplemental oxygen. By the time they got to the University of New Mexico Hospital (UNMH) at 5:17 a.m., Isaac was breathing on his own and at a normal rate, although his breathing remained labored. During an examination later that morning, Isaac regained consciousness but did not display normal brain stem reflexes. By March 27, examinations showed no brain activity, and Isaac was declared dead.

## A. Explanations of Isaac's Injuries

**{8}** After following Isaac to UNMH, Vargas was taken to a police station and questioned. Vargas initially told police that Isaac had been with her and that he had fallen off a couch and hit his head. She maintained this story for roughly six hours before eventually telling the police that Isaac had been with Defendant and Portillo. Defendant and Portillo were then brought in and questioned separately by Detectives Michael Carrasco and Eli Lucero.

**{9}** Defendant initially told the detectives that the last time he had seen Isaac was Sunday, March 22 but eventually agreed that he had seen Isaac the morning of March 25. Defendant explained to Detective Carrasco that Isaac had fallen off a bed and hit an end table. He claimed that Isaac lost consciousness and regained it five minutes later, but then said that Isaac was only unconscious for thirty seconds. Defendant told Detective Lucero that Isaac hit his head hard and that, when Defendant picked Isaac up to put him on the bed, he was dazed and his eyes rolled back. Defendant also told the detectives that he performed CPR on Isaac but later said that he decided not to perform CPR because he heard Isaac breathing. Defendant explained that he then called Vargas to tell her Isaac had fallen and to see what she wanted him to do. We note that Portillo stated in her interview with Detective Lucero that she shook Isaac for ten to fifteen minutes after the fall to try and wake him up.

**{10}** Defendant also testified at trial and gave the following account of the events leading up to Isaac's death. Isaac was staying with Defendant and Portillo on the night of March 24, and when Defendant went to bed at 2 a.m., Isaac was sleeping in a child's bed in the living room. Defendant claimed he was then awakened by a crash, got up, and found Isaac between the nightstand and Defendant's bed. Isaac seemed "dazed" and "confused," and Defendant was concerned about Isaac's reaction to the fall. Defendant stated that Portillo thought it would be a good idea to splash water on Isaac to keep him awake, so Defendant and Portillo took Isaac to the bathroom. Defendant left Isaac with Portillo and started preparing to go back to bed. When Portillo came out of the bathroom with Isaac, Defendant thought he should call Vargas and let her know that Isaac had fallen. Defendant recalled that he was "freaked out" and that Vargas told him to calm down and bring Isaac to her. Defendant then placed Isaac in a car seat and drove to the place where he and Vargas had agreed to meet, at which point Isaac "had fallen back asleep" and was snoring. Defendant then gave Isaac to Vargas, "[s]he gave him a little shake, . . . he opened his eyes," and Defendant went home.

## B. Medical Testimony

**{11}** At trial, several medical experts testified regarding Isaac's injuries. Dr. Shalon Nienow, qualified as an expert in general pediatrics, examined Isaac on the morning of March 25. She testified that Isaac had multiple bruises in several locations around his head. Dr. Heather Jarrell, qualified as an expert in forensic neuropathology, general forensic pathology, and blunt head trauma, supervised Isaac's autopsy on March 30. Dr. Jarrell testified that Isaac had twenty-seven points of bleeding underneath his scalp. Dr. Jon Hallstrom, qualified as an expert in diagnostic neuroradiology, reviewed a CT scan and an MRI of Isaac, both taken on the morning of March 25. Dr. Hallstrom testified that Isaac had multiple subdural hemorrhages, or blood in the space between the brain and a connective tissue that covers the brain called dura matter, in several locations on his brain. Dr. Timothy Winter, a pediatric ophthalmologist at UNMH, reviewed images of Isaac's retinas on March 31. Dr. Winter testified that Isaac had "diffuse hemorrhages, [or] bleeding inside the eye in multiple layers of the retina." Dr. Nienow additionally testified that Isaac's retinal hemorrhages were in "multiple layers too numerous to count[,] out to the periphery of the retina."

**{12}** Several experts testified that subdural and retinal hemorrhages are caused by rapid acceleration and deceleration forces on the brain, such as forces caused by falling, shaking, or blunt-force trauma. As Dr. Hallstrom explained, "if the body's moving and stops suddenly or changes direction suddenly, the brain will continue to move to some degree so it can . . . get sort of a shearing force . . . or impaction force of the brain against other structures." However, Dr. Nienow testified that the bruising on Isaac's head could not have been caused by shaking alone: "The impact injuries to this child's head are caused by blunt-force trauma. There is no other mechanism. Pure shaking cannot cause those injuries." She also explained how the location of the bruises indicates that they must have been the result of more than one impact and that Isaac's retinal hemorrhaging would have been the result of "repeated acceleration/deceleration events."

**{13}** Medical experts further testified about the injuries to Isaac's brain itself. Dr. Hallstrom testified that the images he reviewed showed signs of a "brain edema," an accumulation of fluid or swelling in the brain. He explained that the appearance and distribution of the edema was indicative of a "fairly severe" global hypoxic-ischemic injury, meaning a lack of oxygen and blood to the brain. Dr. Jarrell testified that there was evidence of a "diffuse axonal injury" in Isaac's upper cervical spinal cord, an injury to the connections between neurons which impairs the ability of those neurons to communicate. She explained that an axonal injury can be a "traumatic axonal injury," caused by acceleration or deceleration forces, or it can be a "[v]ascular axonal injury," caused by a "lack of oxygen being delivered to brain cells." She further explained that Isaac had indicators of traumatic axonal injury, but that those indicators are also sometimes caused by "severe hypoxic-ischemic injury."

**{14}** Dr. Nienow and Dr. Jarrell testified that the ultimate cause of Isaac's death was the global hypoxic-ischemic injury. Dr. Nienow explained that after an initial brain injury, the signals to breathe do not work and the brain is then not appropriately oxygenated, leading to hypoxic-ischemic injury. Both Dr. Nienow and Dr. Jarrell testified that a delay in medical treatment reduced Isaac's chances of surviving, but neither could testify to a reasonable degree of medical certainty that Isaac would have lived with earlier medical intervention.

## C.     Verdict

**{15}** At the close of the evidence, the State's overarching theory of the case was that "[e]ither [Defendant] beat that baby, they both beat that baby, or one of them sat by and let it happen, and then they both denied him medical care. Medical care that gave him a chance at surviving."

**{16}** The jury was accordingly instructed on three counts with several alternatives and lesser included offenses. Under Count 1 and its lesser included offenses, the State alleged that Defendant committed child abuse resulting in death by either intentionally or recklessly "caus[ing] physical injury to the head and/or brain with force to Isaac" resulting in his death, or by recklessly permitting such injury to be caused. Under Count 2 and its lesser included offenses, the State alleged that Defendant committed child abuse resulting in death by either intentionally or recklessly "caus[ing] medical neglect" to Isaac, resulting in his death. Under Count 3, the State alleged that Defendant conspired with another person to commit child abuse.

**{17}** After deliberations, the jury found Defendant (1) not guilty of Count 1 and its lesser included alternatives; (2) guilty of Count 2, intentional child abuse resulting in the death of a child under twelve by endangerment, contrary to NMSA 1978, Section 30-6-1(D)(1), (H) (2009); and (3) guilty of Count 3, conspiracy to commit child abuse, contrary to NMSA 1978, Section 30-28-2 (1979) and Section 30-6-1(D). Defendant was sentenced to life imprisonment for Count 2 plus a consecutive sentence of nine years for Count 3, with five years suspended, for an actual sentence of life plus four years. Defendant appeals his convictions of Counts 2 and 3 directly to this Court pursuant to Rule 12-102(A)(1) NMRA.

## II. INTENTIONAL CHILD ABUSE RESULTING IN DEATH BY ENDANGERMENT THROUGH MEDICAL NEGLECT

**{18}**   The jury found Defendant guilty of Count 2, intentional child abuse resulting in the death of a child under twelve by endangerment contrary to Section 30-6-1(D)(1), (H). In pertinent part, Section 30-6-1(D)(1) provides that "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing . . . a child to be . . . placed in a situation that may endanger the child's life or health[.]" Intentional child abuse resulting in the death of a child under twelve carries a sentence of life imprisonment. Section 30-6-1(H); NMSA 1978, Section 31-18-15(A)(1) (2016).

**{19}**   Specifically, Defendant was convicted under a theory of child endangerment by medical neglect. Medical neglect is not defined by the child abuse statute, but we have defined it as the "'[f]ailure to provide medical, dental, or psychiatric care that is necessary to prevent or to treat serious physical or emotional injury or illness.'" *State v. Nichols*, 2016-NMSC-001, ¶ 34, 363 P.3d 1187 (alteration in original) (quoting *Black's Law Dictionary* 1196 (10th ed. 2014)). "Medical neglect, by definition, can only be charged when someone fails to seek or provide necessary medical care, a theory that implies passive involvement." *Nichols*, 2016-NMSC-001, ¶ 34. We noted the novelty of medical neglect as a theory of child abuse by endangerment in *Nichols* but accepted it as viable so long as it is supported by the evidence presented at trial. *Id*. ¶ 45 n.4.

**{20}**   In this case, the State's theory regarding medical neglect was that Defendant, in order to avoid blame for Isaac's injuries, did not call 9-1-1 and instead took Isaac to Vargas:

> When Isaac lost consciousness, all that needed to happen was for 9-1-1 to be called in order to give him a survivable chance, but that didn't happen. [Defendant] did not call 9-1-1, instead, he and his wife delayed things for a period of time while Isaac's brain shut down from oxygen deprivation. And then he took the baby to [Vargas] threatening her, more or less, and kind of passing off the evidence of his actions hoping to keep his hands clean.

**{21}**   Defendant now challenges his conviction, raising two arguments on appeal. First, Defendant argues that the evidence was insufficient to prove that his conduct resulted in Isaac's death or that he acted intentionally. Second, Defendant contends that the jury instructions on this count were in error because there was not an instruction defining causation for the jury and because the instructions included the incorrect mens rea for intentional child abuse by endangerment. Because we determine that the evidence was insufficient to prove that Defendant's conduct resulted in Isaac's death, we need not consider Defendant's second argument regarding improper jury instructions. *See, e.g.*, *State v. Rojo*, 1999-NMSC-001, ¶¶ 1, 27 n.1, 126 N.M. 438, 971 P.2d 829 ("[S]ince we reverse [the d]efendant's kidnapping conviction due to the insufficiency of the evidence, we need not decide whether the district court erred in supplementing the jury instruction for kidnapping.").

**A.    The Jury Instruction Defendant Challenges Remains Part of the Record That We Must Review for Sufficient Evidence of Causation**

**{22}**    "[O]ur review of the sufficiency of the evidence is analytically independent from the issue of the defect in the jury instruction." *State v. Rosaire*, 1996-NMCA-115, ¶ 20, 123 N.M. 250, 939 P.2d 597. We are nevertheless required to consider the sufficiency of the evidence under the instructions given at trial in order to ensure that no double jeopardy concerns are implicated in a retrial. *Dowling*, 2011-NMSC-016, ¶ 18; *State v. Mascareñas,* 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221 (holding that if the appellate court determines that the evidence to support the defendant's conviction was insufficient, double jeopardy concerns bar retrial by the state). "If there [is] insufficient evidence to support the [charge] for which [the d]efendant was convicted and sentenced, the remedy [is] a discharge, not a new trial." *State v. Roper*, 2001-NMCA-093, ¶ 23, 131 N.M. 189, 34 P.3d 133. Therefore, our review for sufficiency of the evidence "consider[s] all of the evidence in support of conviction under the [alleged] erroneous jury instruction." *Mascareñas*, 2000-NMSC-017, ¶ 32 (internal quotation marks and citation omitted). "We do not evaluate the sufficiency of the evidence for instructions that were not given to the jury." *State v. Ramos*, 2013-NMSC-031, ¶ 30, 305 P.3d 921.

**{23}**    Regarding instructional error, Defendant argues that the lack of UJI 14-251 NMRA (2000),[1] which defines causation in homicide cases, resulted in fundamental error because, without that instruction, the requirement of proximate causation was not defined for the jury. The instructions given in this case required the jury to find that Defendant's conduct "resulted in" Isaac's death, and therefore required a finding that Defendant was a but-for cause of Isaac's death. As we will explain, the evidence presented at trial failed to prove but-for causation beyond a reasonable doubt.

**{24}**    Since we conclude that there was insufficient evidence to convict Defendant of child abuse by medical neglect, we do not reach Defendant's argument of instructional error. This is because, even if we were to conclude that lack of UJI 14-251 resulted in fundamental error, double jeopardy would bar retrial in this case. *Dowling*, 2011-NMSC-016, ¶ 18 (explaining that to ensure a defendant is not tried twice for the same crime, retrial is barred if we determine that insufficient evidence supported a conviction).

**{25}**    The dissent would hold that sufficient evidence supported Defendant's conviction under the jury instruction given at trial, determine that "the district court's instruction on causation constituted reversible error," and remand for a new trial. *Diss. op.* ¶¶ 66, 115. Our analysis differs from that of the dissent because we conclude that, under the jury instruction given at trial, the evidence presented was insufficient. This conclusion renders an analysis of the jury instruction argument unnecessary. And because the evidence was insufficient to support the conviction, remanding this case for retrial would violate Defendant's right to be free from double jeopardy.

---

1UJI 14-251 was amended after Defendant's trial. *See* UJI 14-251 NMRA (2017). Unless indicated, all references to UJI 14-251 are to the version in effect during Defendant's trial.

**{26}** Likewise, because the evidence was insufficient to prove that Defendant's conduct resulted in Isaac's death, we need not consider Defendant's arguments regarding mens rea. *See Consaul*, 2014-NMSC-030, ¶ 49 (holding that a charge of child abuse "completely fails for lack of substantial evidence" without proof of causation, and declining to address the defendant's issues of mens rea).

**B.      The Evidence Was Insufficient to Prove That Defendant's Medical Neglect Caused Isaac's Death**

**{27}** Defendant argues that the evidence does not support his conviction for intentional child abuse by endangerment resulting in the death of a child under twelve. Specifically, Defendant argues that the evidence failed to establish that his conduct placed Isaac in a situation that endangered his life or health, that his conduct resulted in Isaac's death, and that he acted intentionally. *See* UJI 14-623 NMRA (2015).

**{28}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "We view the evidence in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *Consaul*, 2014-NMSC-030, ¶ 42 (internal quotation marks and citation omitted). "It is our duty to determine whether any rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). In undertaking this review, we "must take into account both the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." *Flores*, 2010-NMSC-002, ¶ 2.

**{29}** We focus only on the essential element of causation because, as we will explain, the evidence presented did not establish that Defendant's failure to call 9-1-1 resulted in Isaac's death. We evaluate the sufficiency of the evidence under the instructions given to the jury, *State v. Ramos*, 2013-NMSC-031, ¶ 30, 305 P.3d 921, which required the jury to find "beyond a reasonable doubt" that Defendant's conduct "resulted in the death of Isaac Arevalos[,]" *see* Section 30-6-1(D)(1), (H). This instruction is consistent with the general requirement in criminal law that a defendant's conduct be a but-for cause of the prohibited result or, in other words, that the prohibited result would not have occurred absent the defendant's conduct. *See State v. Montoya*, 2003-NMSC-004, ¶¶ 11, 19, 22 & n.1, 133 N.M. 84, 61 P.3d 793 (explaining that a defendant's conduct must generally be a but-for cause of the prohibited result); *cf. Burrage v. United States*, 571 U.S. 204, 210-14 (2014) (considering the ordinary meaning and common understanding of "'results from'" to conclude that usage of the term in a statute imposed a requirement of but-for causation).

**{30}** In *Nichols*, 2016-NMSC-001, ¶ 40, we held that a theory of medical neglect required the state to present substantial evidence that the "medical neglect was at least

a significant cause of [the child's] death." As we explained, but-for causation in a medical neglect case requires "medical evidence that if [the defendant] had obtained medical care earlier, [the child] would have lived or at least would have had a significantly greater chance of living—evidence that the alleged neglect actually contributed to the tragic result." *Id.*

**{31}** In *Nichols*, the defendant's child died due to blood loss associated with blunt-force abdominal trauma. *Id.* ¶¶ 2, 20. The state charged the defendant with several counts of child abuse under an overarching theory that he inflicted the injuries on his child and then failed to provide or obtain the medical care necessary to save the child's life. *Id.* ¶¶ 25-26, 46-47. The jury acquitted the defendant of having inflicted the initial injuries but found him guilty of child abuse by medical neglect. *Id.* ¶¶ 25-26. The medical experts testified that the cause of death was the blood loss from the abdominal trauma and that, while survival of such an injury would be possible, it would be unlikely without extensive medical intervention. *Id.* ¶¶ 41-42. This evidence did not shed light "on when that intervention would have been necessary to save [the child] or give him an appreciably better chance of survival" and left the jury "to speculate that if [the defendant] had called 911 sooner, then perhaps the doctors would have had time to diagnose [the child's] condition and treat him successfully." *Id.* ¶¶ 43-44. In *Nichols* we concluded that evidence showing the child may have lived with earlier medical care was insufficient to prove beyond a reasonable doubt that the defendant's failure to obtain that care resulted in the child's death. *Id.* ¶¶ 44-45. As in *Nichols*, *id.* ¶¶ 39, 43-44, the evidence in this case clearly established a causal connection between Isaac's injuries and his death but failed to establish a connection between his death and Defendant's delay in obtaining medical care.

**{32}** The medical experts in this case testified to Isaac's various injuries, including bruising, bleeding underneath the scalp, and subdural hemorrhages in several locations around his head, as well as retinal hemorrhages in both eyes. Dr. Nienow testified that, based on the appearance of the injuries alone, she could only say that they had occurred within a week of Isaac's death but that Isaac's loss of consciousness indicates the brain trauma occurred at that time.

**{33}** Multiple experts opined that the ultimate cause of Isaac's death was the global hypoxic-ischemic injury or, in other words, a lack of blood and oxygen to the brain. Dr. Nienow explained that global hypoxic-ischemic injury results from brain trauma due to a "whole cascade of events that causes further and further brain injury" because the signals to breathe do not work, the child stops breathing effectively, and the brain is then not oxygenated properly. She further testified that this progression is rapid, that "[e]very second that this child is not presented to immediate medical attention is a second that that child's brain is dying[,]" and that the best way to stop this progression is "to get the kid oxygen . . . [a]s soon as possible."

**{34}** Both Vargas and Arevalos testified that Isaac was having difficulty breathing when Vargas took Isaac from Defendant. Isaac's respiratory rate was well below normal when the paramedics arrived at the Arevalos home. The paramedics were able to bring Isaac's breathing up to a normal rate, and Dr. Nienow testified that this intervention

brought Isaac's oxygen saturation up to 100 percent, at which point there was "no more continued hypoxia." Despite this, Dr. Nienow testified that the global hypoxic-ischemic injury was already so widespread by the time the paramedics arrived that "the deed was done." All of this evidence indicates that when Isaac lost consciousness, he was in need of immediate medical attention to address the progression of the hypoxic-ischemic injury. However, none of the medical experts testified to a reasonable degree of medical certainty that Isaac would have lived with earlier medical care.

{35}    Dr. Hallstrom only testified that how soon medical care is provided could impact the outcome for a person suffering from subdural hemorrhaging and loss of oxygen to the brain, depending on the severity of the injury. Dr. Jarrell testified that patients with diffuse axonal injuries such as Isaac's generally have a seven to thirty percent chance of surviving. She opined that such injuries require medical attention and that a delay in medical attention "drastically reduce[s] . . . the chance of survival" but agreed that she could not say "with any degree of medical certainty" that "earlier medical intervention would have made a difference for [Isaac.]" Dr. Nienow testified more specifically that "[t]here is a very real possibility that had [Isaac] presented for immediate medical attention after the initial neurologic insult he would still be alive." She further opined that the delay in medical attention "took away that possibility" but did admit that she was "not saying it is a medical certainty" that Isaac would be alive had he received immediate medical attention. We agree with Defendant that the inability of the State's medical experts to testify to a reasonable degree of medical certainty that Isaac would have lived with earlier medical attention is fatal to the State's theory that Defendant caused Isaac's death by not calling 9-1-1 when Isaac was injured.

{36}    Medical expert testimony given to a reasonable degree of medical certainty or probability satisfies a "minimal standard of probability," approximating a preponderance of the evidence. *Consaul*, 2014-NMSC-030, ¶¶ 69, 73 (noting that "'reasonable medical probability'" is defined as "'a showing that the injury was more likely than not caused by a particular stimulus, based on the general consensus of recognized medical thought.— *Also termed reasonable medical certainty*'" (quoting *Black's Law Dictionary* 1380 (9th ed. 2009))). Therefore, the medical experts in this case were not even able to opine that it was more likely than not that Isaac would have lived with earlier medical care. At best, Dr. Nienow provided testimony that there was a "very real possibility" that Isaac could have lived with immediate medical attention, which is evidence that Isaac might have survived had Defendant called 9-1-1 instead of Vargas. This is simply insufficient to prove that Defendant's conduct was an actual cause of Isaac's death. *See Consaul*, 2014-NMSC-030, ¶ 69 ("We recognize that some of the medical opinions offered in this case spoke only in terms of 'possibilities' or 'concerns,' which essentially proves nothing."); *Nichols*, 2016-NMSC-001, ¶¶ 44-45 (concluding that the state's "suggestion that 'maybe' or 'perhaps' something would or would not have happened, even if based on evidence, is not probative of anything"). As we held in *Consaul*, if the state relies on medical expert testimony to prove causation, those experts must at least offer opinions on causation to a reasonable degree of medical certainty, even if the state presents other "non-opinion evidence" of causation. 2014-NMSC-030, ¶ 73.

**{37}**    The State contends that no such testimony is required, arguing that the evidence that Isaac had a chance of survival which was foreclosed by Defendant's failure to call 9-1-1 is sufficient to prove causation under *Nichols* and *Montoya*. In support of this argument, the State relies both on Dr. Nienow's testimony that Isaac had a "very real possibility" of survival with immediate medical attention but that the delay "took away that possibility" and on Dr. Jarrell's testimony that a delay in medical care "drastically reduce[s]" the chance of survival. The State does not contend that Defendant's failure to obtain medical care caused Isaac's death. Instead, the State's argument for sufficiency of the evidence in this case is actually based on the State's novel lost-chance-of-survival causation theory: Defendant removed the possibility of Isaac's survival. In other words, the State argues that Defendant's failure to act caused Isaac to lose any chance he had of surviving. The State's arguments are unavailing for two reasons.

**{38}**    First, the State argues, quoting *Nichols*, 2016-NMSC-001, ¶ 40, that such testimony proves Isaac "would have had a significantly greater chance of living" with earlier medical attention, sufficient to prove that Defendant's failure to call 9-1-1 was a significant cause of Isaac's death. We acknowledge this language in *Nichols* could be read to indicate that the State was not required to present evidence that Isaac would not have died absent Defendant's medical neglect. *But see id.* (requiring evidence that the child "would have lived *or* at least would have had a significantly greater chance of living" to prove causation (emphasis added)). However, *Nichols* did not part from the general principle of criminal law that a defendant's conduct must at least be a but-for cause of the death to be a significant cause of that death. *See id.* (citing UJI 14-251); *see also* 1 Wayne R. La Fave, Substantive Criminal Law § 6.2(d), at 607 (3d ed. 2018) ("Legal or 'proximate' cause, at the very least, requires a showing of 'but for' causation: but for the omission the victim would not have died." (footnote omitted)). To hold otherwise would require less to prove causation in a criminal prosecution than is required to prove causation for a claim of negligence in tort. *See, e.g.*, *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶¶ 6, 34, 134 N.M. 43, 73 P.3d 181 (explaining that a negligence claim requires that a defendant's conduct be both the proximate cause and the but-for cause (i.e., "cause in fact") of the injury).

**{39}**    The dissent asserts that the majority departs from *Nichols* by creating a higher causation standard. *Diss. op.* ¶¶ 100-101, 103, 105. The dissent reasons that because *Nichols* states that causation is met if the victim would have had a "significantly greater chance of living," there was enough in the instant case to prove that Defendant's failure to call 9-1-1 caused Isaac's death. *Diss. op.* ¶ 105-107. We hold differently because when the *Nichols* Court explained causation in a medical neglect context, it did not abandon the foundational criminal principle of but-for causation. We confirm here that causation in a criminal medical neglect case must include but-for causation and no less. We adhere to our long-established standard in this case by rejecting both the State's lost-chance-of-survival causation theory and the dissent's view, either of which would lower the causation standard and erode the requirement of but-for causation.

**{40}**    Evidence that a child's chance of survival was foreclosed by a defendant's failure to provide necessary medical care is not proof beyond a reasonable doubt that the defendant's conduct was a factual, but-for cause of that child's death. *See Montoya,*

2003-NMSC-004, ¶ 19 ("[A] defendant is a but for cause of death if the death would not have occurred at the time it did and in the manner it did but for defendant's actions."); LaFave, *supra*, at 607 ("Failure on the part of a parent to call a doctor for a sick child may often make the parent criminally liable for the child's death; but only if the doctor could have saved it, not if it would have died in spite of medical attention."). We therefore clarify that proof of causation under *Nichols* requires that the medical neglect be a factual, but-for cause of the child's death or, in other words, that the child would not have died when and how the child died absent the defendant's failure to obtain necessary medical care.

**{41}** Second, the State relies on our sufficiency of the evidence review in *Montoya*, which does not ultimately support the State's theory in this case. Although the jury in *Montoya* was given an instruction based on UJI 14-251, the trial judge orally instructed the jury that the state was not required to prove beyond a reasonable doubt that the defendant was a but-for cause of the victim's death. 2003-NMSC-004, ¶¶ 11, 15-17, 22-24. The error in *Montoya* resulted from the confusion created by these conflicting directives to the jury, given that UJI 14-251 *does* require such proof of but-for causation. *Montoya*, 2003-NMSC-004, ¶¶ 11, 15-17, 22-24. We concluded that the jury instruction misstated the requirements of UJI 14-251 and constituted reversible error. *Montoya*, 2003-NMSC-004, ¶¶ 22-24.

**{42}** We acknowledge that our holding in *Montoya* might be read to accept a lost-chance-of-survival theory as sufficient to show causation in a murder case. *Id.* ¶ 30 (holding that "[t]he expert medical testimony and the discussion about taking the victim to the hospital combine to permit a conclusion that [the d]efendant's actions were a cause in the death of the victim"). However, *Montoya* identifies as error the failure to clearly instruct the jury on but-for causation, explicitly holding that "UJI 14-251 requires a showing of but for causation," and rejecting the dissent's suggestion that conduct which makes any contribution to death or is a "substantial factor" is a cause of death. *Id.* ¶¶ 19-21. The ensuing sufficiency discussion makes no attempt to reconcile a lost-chance-of-survival theory with the but-for causation requirement. *Id.* ¶¶ 27-30. Perhaps this is because no such reconciliation is available—if a defendant denies a victim only a possibility of survival, one cannot logically say that, but for the defendant's conduct, the victim would not have died.

**{43}** In *Nichols*, as discussed above, we affirmed the but-for causation requirement in cases of child abuse causing death, holding that evidence of possible causation is insufficient. 2016-NMSC-001, ¶¶ 39-40, 44-45 (rejecting as probative of causation testimony "that 'maybe' or 'perhaps' something would or would not have happened"). *Nichols* decided this issue in a scenario analogous to this case—where the defendant's reckless failure to obtain medical care is alleged to have resulted in a child's death. *Id.* ¶ 1. As such, we are bound by the precedent established in *Nichols* and so we follow that standard in this case. We do not veer from *Nichols* by deciding whether *Montoya's* reasoning regarding a lost chance of survival might have some application in another context. *See, e.g.*, William Wilson, *Murder by Omission: Some Observations on a Mismatch Between the General and Special Parts*, 13 New Crim. L. Rev. 1, 9-10, 17-22 (2010) (arguing that loosening causal nexus requirements in lost-chance-of-survival

cases, and similar cases where an omission has an unclear role in the victim's death, can be justified where the defendant intends to harm the victim but noting that "[i]t is far easier to infer what is intended from actions than from omissions" and that "attitude of mind designated as intention by the criminal law is more directly associated with and evidenced by what we do than by what we do not do"); *see also* Bradley D. Price, *Taking a Chance with the Burden of Proof: The But-For Test in Homicide Case Law*, 92 Iowa L. Rev. 703, 731-737 (2007) (arguing that *Montoya* and other similar cases are best understood as "incomplete crimes" such as attempted murder or attempted manslaughter).

**{44}** Nor are we persuaded by the dissent's additional arguments in favor of embracing a lost-chance-of-survival theory of causation here. The dissent asserts that failing to recognize such a theory would incentivize would-be defendants to abstain from seeking medical attention for a victim, to ensure that the survivability of an injury remains uncertain. *Diss. op.* ¶ 113. We think this outcome is unlikely. Among other things, the failure to act in response to the victim's potentially fatal condition will often hasten the victim's death, or at least result in some measurable worsening of the victim's condition. Here, it appears the State might have charged Defendant with causing great bodily harm to Isaac. The evidence presented at trial showed that, while Isaac's initial neurologic injuries may have been sufficient to cause his death, Defendant's inaction (precluding earlier medical intervention) probably worsened those injuries. *See* UJI 14-131 NMRA (defining great bodily harm to include an injury that results in permanent impairment of an organ); § 30-6-1 (E) (criminalizing as a first-degree felony child abuse that results in great bodily harm). But the State did not pursue this theory of prosecution, either in its charging decisions or in its questioning of the expert witnesses. *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The [C]ourt will not consider . . . issues . . . unaccompanied by some effort at developed argumentation.").

**{45}** We consider the dissent's reliance on *Alberts v. Schultz*, 1999-NMSC-015, ¶ 30, 126 N.M. 807, 975 P.2d 1279——where we stated that "[a] physician should not be able to avoid liability on the ground that it is uncertain what the outcome would have been" (internal quotation marks and citation omitted)——to be a misapplication. *Diss. op.* ¶ 113. *Alberts* was a tort case in which we recognized as compensable (in the context of medical malpractice) the lost chance of a better outcome. 1999-NMSC-015, ¶ 21. In such cases, the injury is not the ultimate injury or death but the lost chance of avoiding injury, calculated as the "percentage value of the patient's chance for a better outcome prior to the negligent act." *Id*. ¶¶ 21, 31. That theory of liability has no application here, where the State was required to prove beyond a reasonable doubt its charge that Defendant caused the ultimate result—Isaac's death.

**{46}** We note that the State may also have sought to prove that Isaac would have lived longer than he did following his loss of consciousness if Defendant had sought medical attention. *Montoya*, 2003-NMSC-004, ¶ 19 ("[A] defendant is a but[-]for cause of death if *the death would not have occurred at the time it did* and in the manner it did but for defendant's actions." (emphasis added)). But the State did not pursue this theory, either. The expert witnesses were not asked whether, in their opinions,

Defendant's failure to obtain medical attention hastened Isaac's death, nor does the evidence otherwise support that conclusion. Though Dr. Nienow testified that "every second counts" for preventing hypoxic cell death in the brain, no expert said to any degree of medical certainty whether medical intervention (such as prompt oxygen support) would have prolonged Isaac's life. Instead, the experts testified that injuries such as Isaac's often result in rapid and irreversible hypoxia in the brain, even with prompt medical intervention. Accordingly, intervention may or may not have made a difference. Unsupported by testimony in the record are the dissent's assertions to the contrary. *See, e.g.*, *diss. op.* ¶ 94 ("Dr. Hallstrom testified that the delay in medical care affects, and ultimately determines, whether the injury is survivable.").

**{47}**    The evidence presented in this case failed to establish even that it was more likely than not that Isaac would have lived, or lived longer, had he received immediate medical attention. To convict Defendant, the jury was required to speculate that Isaac might have survived had Defendant immediately called 9-1-1. Because the jury's verdict required such speculation, and because we conclude that the evidence was insufficient to prove that Defendant's conduct resulted in Isaac's death, we reverse his conviction for intentional child abuse resulting in the death of a child under twelve by endangerment.

## III.    CONSPIRACY

**{48}**    Defendant additionally challenges the sufficiency of the evidence supporting his conviction of conspiracy to commit child abuse. Under Section 30-28-2(A), "[c]onspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state." "Conspiracy is a specific intent crime" requiring a defendant to "have the requisite intent to agree and the intent to commit the offense that is the object of the conspiracy." *State v. Trujillo*, 2002-NMSC-005, ¶ 62, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted). "The criminal agreement is the gist of the crime of conspiracy. A conspiracy is complete when the agreement is entered." *State v. Carrasco*, 1997-NMSC-047, ¶ 39, 124 N.M. 64, 946 P.2d 1075 (citation omitted). "Conspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties. A formal agreement need not be proved; a mutually implied understanding is sufficient to establish the conspiracy." *State v. Torres*, 2018-NMSC-013, ¶ 50, 413 P.3d 467 (internal quotation marks and citation omitted).

**{49}**    In this case, the State's theory in support of the conspiracy charge was that Defendant and Portillo

> act[ed] in cahoots with one another. Two people who see a baby go down and lose consciousness and don't do anything meaningful to help him. Two people who are responsible for major blunt force trauma to a baby's head and neither stops the other. Two people who did nothing to prevent a baby's death.

Now, they had intent to commit child abuse. . . . [E]ither one person stood by while the baby was brutally beaten to death and they did nothing, or they both did it. Either way, [Defendant], in this trial, is wholly culpable for his choices.

Considering the evidence presented in this case, we conclude that it was insufficient to support an inference that Defendant and Portillo formed a mutually implied agreement to commit child abuse against Isaac for the following reasons.

**{50}** First, while the evidence supports that Isaac suffered serious injuries while in the care of Defendant and Portillo, no evidence was presented from which the jury could even infer that Defendant formed an agreement with Portillo to inflict those injuries. In fact, the jury found Defendant not guilty of either causing the injuries to be inflicted or permitting Portillo to do so.

**{51}** Second, the evidence presented was insufficient to support an inference that Defendant and Portillo agreed to abuse Isaac through medical neglect. According to Defendant's testimony at trial and statements to police, Defendant and Portillo both carried Isaac into the bathroom on Portillo's suggestion to keep Isaac awake by splashing water on him. Defendant testified that it was then his idea to call Vargas and that he was the one to make the call. The only action that Defendant and Portillo took together was taking Isaac to the bathroom, which does not reveal a mutually implied agreement to commit child abuse by denying Isaac necessary medical care. Furthermore, whether calling Vargas instead of 9-1-1 does or does not demonstrate such an intent, there is no indication in the evidence presented that Portillo agreed with Defendant's decision to do so. We therefore agree with Defendant that there was insufficient evidence to support that Defendant and Portillo formed an agreement, mutually implied or otherwise, to commit child abuse against Isaac, and we reverse Defendant's conviction of conspiracy to commit child abuse.

## IV. CONCLUSION

**{52}** Proving causation is challenging in cases such as this one, where Defendant's omission following a serious injury to a child is alleged to be a cause of the child's death. Concern that the guilty may go unpunished, even in tragic cases such as this one, does not compel us to relax causation requirements where, as here, sufficient proof of causation is lacking.

**{53}** For the foregoing reasons, we reverse Defendant's convictions for intentional child abuse resulting in the death of a child under twelve and conspiracy to commit child abuse, and we dismiss the charges against Defendant.

**{54} IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**C. SHANNON BACON, Justice**

**JUDITH K. NAKAMURA, Justice, Retired,**
**sitting by designation**

**DAVID K. THOMSON, Justice,**
**dissenting in part and concurring in part**

**THOMSON, Justice (dissenting in part and concurring in part).**

**{55}**    "A person may cause evil to others not only by his actions but by his inaction, and in either case he is justly accountable to them for the injury." John Stuart Mill, *On Liberty* 15 (Batoche Books 2001). I agree that "Isaac's death was undeniably tragic," *maj. op.* ¶ 3, and I acknowledge that criminal liability for failing to seek or provide necessary medical care "is a matter which often is not susceptible of easy proof." 1 La Fave, *supra*, § 6.2(d), at 607. However, I cannot agree with the majority's determination that the evidence presented did not establish that Defendant's conduct resulted in Isaac's death. *Maj. op.* ¶ 29. Nor can I agree that, as courts of justice, instructing juries that they must simply find the conduct "resulted in" the death adequately explains to jurors how to navigate the complex issue of proximate cause, especially when they are presented with two different causes of death. In this case, the State argued that Defendant was guilty of Isaac's death under two theories: (1) Defendant or Portillo (with Defendant's knowledge) directly caused the trauma to Isaac's head; and/or (2) Defendant failed to act, to get medical care for Isaac, after he was aware Isaac was seriously injured. Defendant was convicted under the second theory.

**{56}**    The jury found that Defendant "caused medical neglect" by not calling emergency services or otherwise seeking medical attention for Isaac, and this omission, or failure to act, "placed [Isaac] in a situation that endangered [his] life or health" and "resulted in" Isaac's death. *See* NMSA 1978, § 30-6-1 (2009) (defining the crime of child abuse or abandonment and the levels of culpability). The majority however reverses the conviction because it determines that there was sufficient evidence that Defendant's conduct amounted to medical neglect, but there was insufficient evidence that this neglect resulted in Isaac's death. They reach this conclusion even though Defendant *never sought* medical attention for Isaac, when medical attention would have still made a difference, and tried to avoid the authorities discovering that Isaac was in his care. *See maj. op.* ¶¶ 29, 31, 38, 40.

**{57}**    In so doing, the majority announces a higher standard of "but-for" causation than has previously been required and applies that standard retroactively. *See Nichols*, 2016-NMSC-001, ¶ 40 (holding a defendant's conduct may be a but-for cause of death if there is testimony that the victim would have "lived *or* at least would have *had a significantly greater chance of living*" (emphasis added)). The majority now requires that to establish causation, a medical expert must testify that a victim would have *lived* if a

defendant had not delayed seeking, or failed to ever seek, medical care. *See maj. op.* ¶¶ 35, 40.

**{58}** Respectfully, I do not understand why the statute that criminalizes child abuse resulting in the death of a child should be singled out for this higher causation standard, nor do I see how this standard can be contained to the category of homicide.

**{59}** Most importantly, I do not agree with this abrogation of our precedent, which disregards the general principle of criminal law that a particular defendant may be *a* legal cause of death even though there are other *significant causes* that "contributed" to the death. *See, e.g.*, *Montoya*, 2003-NMSC-004, ¶ 19 (observing that "a defendant is a but for cause of death if the death would not have occurred *at the time it did and in the manner it did* but for defendant's actions" (emphasis added)); *Nichols*, 2016-NMSC-001, ¶ 40 (requiring "substantial evidence that [the] neglect 'resulted in' . . . death or great bodily harm, meaning that medical neglect was *at least a significant cause* of his death or great bodily injury" (emphasis added)); *State v. Simpson*, 1993-NMSC-073, ¶ 14, 116 N.M. 768, 867 P.2d 1150 (observing that "[g]eneral principles of criminal law do not require that a defendant's conduct be the *sole* cause of the crime. Instead, it is only required that the result be proximately caused by, or the 'natural and probable consequence of,' the accused's conduct" (quoting 1 Charles E. Torcia, *Wharton's Criminal Law* § 26, at 124-26 (14th ed. 1978)); *see also Burrage v. United States*, 571 U.S. 204, 215-16 (2014) (observing that legal authority exists for holding act or omission to be a "cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result" but declining to adopt a permissive construction of the federal statute in that case); 1 La Fave, *supra*, § 6.4(b), at 636-37 (recognizing that a defendant may be an actual, but-for cause of death by "hastening" the victim's death). The majority should not use the phrase "when and how the child died," *see maj. op.* ¶ 40, when reciting these words means nothing, if they simultaneously eliminate the substance by rejecting the "significant cause" test of but-for causation laid out clearly in our precedent.

**{60}** The majority concludes that the medical testimony was insufficient to establish that "Defendant's conduct was an actual cause of Isaac's death" because none of the medical experts testified "to a reasonable degree of medical certainty that Isaac would have lived with earlier medical attention." *Maj. op.* ¶¶ 31, 35, 36. In other words, for there to be sufficient evidence to convict a defendant on a theory of medical neglect, the rule announced by the majority requires the state to prove through medical testimony: (1) that if the victim receives medical care before a specific point in time, the victim would have *lived*; and (2) that prior to this point, the defendant would have realized the victim required immediate medical intervention in order to live. *Maj. op.* ¶¶ 31, 35, 36. Without this testimony, and evidence that a defendant was able to act and did not, the majority would not allow a conviction to stand if it was based on a theory of medical neglect. *Maj. op.* ¶ 38. Further, it is not clear whether the majority reserves this new standard for only medical neglect child abuse cases or whether it is generally applicable to homicides similar to the ones with which the defendant in *Montoya* was charged.

**{61}** I would not change the standard established by our precedent, that under a theory of medical neglect, a defendant may be a "but-for" cause if that defendant's

neglect is a "significant cause" of death. *See maj. op.* ¶¶ 1, 38 (describing the State's legal theory of culpable conduct as "Isaac died as a result of Defendant's decision not to call 9-1-1 after Isaac was injured"). Because the majority holds that unless a medical expert testifies with medical certainty that a defendant's intervention would have saved a victim's life there cannot be sufficient evidence to support a conviction, I must dissent.

**{62}** Further, when the resulting crime has more than one cause (regardless of whether those causes are acts, omissions, or a combination of both), the complex causation analysis must be explained to a jury. I believe that what is most problematic in this case is not the sufficiency of the evidence, but instead, the district court's instructions to the jury concerning causation. By sidestepping the causation instruction, the district court and the majority fail to take this opportunity to provide guidance to courts and jurors that struggle with the difficult theory of medical neglect in child abuse cases.

**{63}** Since medical neglect is a theory that rests on the failure to provide medical intervention (an omission), the theory is usually predicated on an injury that results from a separate primary injury. This case illustrates why medical neglect child abuse cases require careful application of but-for *and* proximate causation analyses, because it is not atypical that a defendant charged with medical neglect is also charged with a concurrent act of abuse.[2] *Nichols* suggests, but does not hold, that instructing on proximate cause is necessary. 2016-NMSC-001, ¶ 40. Although the district court was aware of *Nichols*, it elected not to instruct the jury on proximate cause. Instead, the district court simply instructed the jury that it had to find that defendant's conduct "resulted in" Isaac's death, which the majority now condones. I would hold that moving forward this is unacceptable in multiple cause cases and will explain how requiring a proximate cause instruction, based on UJI 14-251, would have simplified and clarified the issue before the jury.

**{64}** I first turn to the issue of the jury instructions, followed by my analysis of the sufficiency of the evidence, and conclude by addressing the perverse incentives created by the majority's new standard. Since I would hold that sufficient evidence supports Defendant's conviction and that the instructions constitute reversible error, I would not substitute this Court's judgment for the jury's but would remand for a new trial.

## I.     The Causation Problem and the Jury Instruction

**{65}** "Technically speaking, everything that contributes to a given result is, as a matter of fact, a cause of that result." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 141 (3rd ed. 2011). However, "[i]n the end, legal terminology reflects the fact that courts are concerned with determining 'cause' from the standpoint of attaching liability, not ascertaining physical or medical cause." *Id.* "The law has long considered causation a

---

[2]I acknowledge that care must be taken in child abuse cases where medical testimony is used to establish that a defendant's acts caused a particular injury. *See Consaul,* 2014-NMSC-030, ¶ 55. However, the medical testimony on whether the failure to seek medical care was a significant cause of death is a different nature, because it simply asks (regardless of who committed the act) whether medical care could have made a difference after a defendant realizes that the child has been injured and requires medical attention.

hybrid concept, consisting of two constituent parts: actual cause and legal cause." *Burrage*, 571 U.S. at 210. When, as here, a crime requires a specified result that is a consequence of a particular defendant's specified conduct, the "defendant generally may not be convicted unless his conduct is both (1) [an] actual cause, and (2) [a] 'legal' cause (often called the 'proximate cause') of the result." *Id.* (internal quotation marks and citation omitted). A court's function is to explain to twelve citizen jurors how a concurrent cause based on neglect can be a legal cause of death.

**{66}** The majority correctly observes that, "[a]t the close of evidence, the State's overarching theory of the case was that '[e]ither [Defendant] beat that baby, they both beat that baby, or one of them sat by and let it happen, and then they both denied him medical care. Medical care that gave him a chance at surviving." *Maj. op.* ¶ 15. The jury acquitted Defendant of hitting Isaac or letting Isaac be hit; however, the jury convicted Defendant for denying Isaac necessary medical care. Under the alternative theory, Defendant was culpable because there was a point at which he recognized that medical care was necessary and denied Isaac that care. This neglect "resulted in" Isaac's death, because he hastened Isaac's death. In *Nichols*, the jury was similarly instructed, and this Court deemed those instructions minimally sufficient. However, I do not agree that the instructions here were adequate and would take this opportunity to prospectively require trial courts to provide a proximate cause instruction in similarly complex cases.

**{67}** Defendant argued that the district court should have instructed the jury on proximate cause, because the instructions given were legally insufficient based on the State's medical neglect theory of culpability. The majority dismissively references this argument and concludes that "even if we were to agree that the absence of UJI 14-251 resulted in fundamental error" the opinion need not address it, "[b]ecause the evidence was insufficient to prove that Defendant's conduct resulted in Isaac's death." *Maj. op.* ¶ 21. I disagree and believe that the opinion should clarify the complicated issue of causation. The instruction here did not adequately explain how Defendant could be culpable, could be a legal cause of Isaac's death and how comparative causes are handled. Moreover, I believe that the error was preserved, and therefore, that the jury instructions should be reviewed for reversible error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

## A.    Preservation of the Question of Error

**{68}** "To preserve an issue for review it must appear that a ruling or decision by the [district] court was fairly invoked." Rule 12-321 NMRA.

**{69}** In an effort to resolve the question of how to instruct the jury on the theory of medical neglect, the district court reviewed *Nichols* and stated, "a definition for medical neglect . . . hasn't been submitted, but I would suggest [that definition] may be necessary to clarify that issue." Defense counsel objected and argued that "the State hasn't presented adequate evidence that the failure to provide medical assistance caused the death . . . [,] . . . and so if we're going to add the definition of medical neglect, we should also submit a jury instruction on the standard and definition for causation [, UJI 14-251]." Faced with this objection, the district court concluded, "Uh-

huh. Well, we will just leave it out," and unfortunately decided not to instruct on proximate cause or the definition of medical neglect.

{70}    Defendant's objection fairly invoked a ruling by the district court not to instruct on proximate cause when it was central to the State's theory on which the jury convicted. Therefore, I would review the instructions for reversible error, not fundamental error. That said, I would hold that retrial is required even under the fundamental error standard for the reasons that follow. *State v. Osborne*, 1991-NMSC-032, ¶ 40, 111 N.M. 654, 808 P.2d 624 (1991) (observing that "it is the duty of the court, not the defendant, to instruct the jury on the essential elements of a crime" and holding that it is fundamental error to fail to instruct on an essential element of a crime).

## B.    Standard of Review

{71}    When reviewing jury instructions, this Court asks "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Benally*, 2001-NMSC-033, ¶ 12 (internal quotation marks and citation omitted). A "facially erroneous" instruction is "an incurable problem and mandates reversal." *State v. Parish*, 1994-NMSC-073, ¶ 4, 118 N.M. 39, 878 P.2d 988. But if the instruction is subject to "more than one interpretation, then the court must next evaluate whether another part of the jury instructions satisfactorily cures the ambiguity." *Id.* "[J]uror confusion or misdirection may stem . . . from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12. If "a reasonable juror would have been confused or misdirected" by the defective instruction "reversible error arises." *Parish*, 1994-NMSC-073, ¶ 4.

{72}    I further observe that this Court previously stated, "It is humanly impossible to create a written code that anticipates every eventuality." *Id.* ¶ 25. The use of the uniform jury instructions "does not preclude this Court from insuring that the rights of individuals are protected," if those instructions do not correctly state the law. *Id.* ¶ 26. I would hold that juror confusion and misdirection occurred here because the district court failed to properly instruct on proximate cause.

## C.    The Instruction on Child Abuse Resulting in Death by Medical Neglect

{73}    Although the State presented evidence that Isaac suffered significant head trauma, the jury necessarily determined that Defendant did not intentionally or recklessly cause or permit that head trauma by acquitting Defendant on Count 1. The jury was also instructed on a theory that there was a concurrent cause of death, an omission, and they could convict on a theory of "medical neglect" if they found:

1.    [Defendant] caused medical neglect to [Isaac];
2.    By engaging the conduct described in Paragraph 1, [Defendant] caused [Isaac] to be placed in a situation that endangered the life or health of [Isaac];
3.    [Defendant] acted intentionally and without justification;

4.  [Defendant]'s conduct resulted in the death of [Isaac];
5.  [Isaac] was under the age of twelve (12);
6.  This happened in New Mexico on or between the 20th day of March, 2015 and the 25th day of March, 2015.

*See* UJI 14-623 NMRA.

**1.  The confusion created by not instructing on proximate cause**

**{74}** The majority appears to be satisfied with allowing prosecutors in child abuse resulting in death cases to continue to rely on the vague standard of "resulted in" when the death results from multiple causes or actors. I would hold that this tolerates an unacceptable level of confusion. The majority opinion does not clarify, as it should, that in multiple actor cases in the killing of a child, the jury should be told actions and inactions are treated equally, and each person is liable if their actions were a significant cause of the death of the victim. The jury here received no guidance on "proximate cause" when it was faced with two contributing causes, both of which contributed to one death. Proximate cause is an "obscure" legal concept, which is *selected* by courts and which requires a common sense explanation to jurors. *See* Joshua Dressler, *Understanding Criminal Law*, § 14.03[A], at 180 (8th ed. 2018) ("The decision to attach causal responsibility for social harm to one, rather than to another, factor is made in a common sense manner, or by application of moral intuitions, public policy considerations, and/or a sense of justice."). For this reason, I believe that instructing the jury that it may convict simply because it determines the conduct "resulted in" a victim's death is inadequate.

**{75}** If parent A strikes child C and the child dies, a direct application of "resulted in" makes sense. In this example, there is only one cause of death. However, when a second concurrent cause is introduced, as when parent A strikes child C and parent B knows that the child is injured and later dies because parent B does nothing to provide necessary medical care, our policy is to hold both parents equally culpable *if* the failure to provide medical care is a significant cause. *See Nichols*, 2016-NMSC-001, ¶ 40. This is a policy choice. Parent B did not act and was not the sole cause of death; however, by failing to provide necessary medical care Parent B may be a significant cause of death. *Id.* I would hold that the failure to instruct on this obscure concept, to provide an accurate explanation of the legal requirements of factual and proximate causation, creates reversible error. *See Benally*, 2001-NMSC-033, ¶ 12. This problem is clearly resolved by providing the proximate cause instruction, UJI 14-251, as *Nichols* suggests.

**{76}** Medical neglect claims are usually precipitated by an accident or overt act that results in a physical injury. Absent the initial injury, medical intervention would not be required, and therefore, multiple causes are inherent in medical neglect prosecutions. *Montoya* clearly illustrates the type of confusion that can result in a criminal case concerning medical neglect.[3] Although it does not involve child abuse, *Montoya* is

---

3Everyone at trial in *Montoya* appears to have been confused about causation: the prosecution improperly argued "but for" causation, the defense misrepresented the prosecution's burden under the

factually similar to this case in that there were concurrent actors with an act and an omission that resulted in death. The victim was shot, not by the defendant, but by another person. 2003-NMSC-004, ¶ 6. Like Isaac, the victim did not immediately succumb to the initial injury. The defendant, who was aware of the gunshot wound, drove the victim away from the hospital to a river and abandoned the vehicle and the victim, who was still alive. *Id.* ¶ 7. The victim was discovered the next day, having partially pulled himself out of the vehicle. *Id.* ¶ 8.The defendant was not charged for shooting the victim, but-for the culpable act of electing not to seek medical attention. This Court opined "[t]he expert medical testimony *and* the discussion about taking the victim to the hospital combine to permit a conclusion that [the d]efendant's actions were a cause in death." *Id.* ¶ 30 (emphasis added).

**{77}**  The foundation for the *Montoya* Court's reasoning dates back to *Simpson*, which established that there may be more than one cause of death, so long as there is a significant connection—if the result was a "natural and probable consequence of" a defendant's act (or omission). *See Montoya*, 2003-NMSC-004, ¶¶ 12, 24, 30; *Simpson*, 1993-NMSC-073, ¶ 14; *see also* UJI 14-251 NMRA ("There may be more than one significant cause of death. If the acts of two or more persons significantly contribute to the cause of death, each act is a significant cause of death.").

**{78}**  Applying the *Montoya* Court's significant cause test of but-for causation, we know that a parent is not relieved of culpability simply because they failed to act, when that failure (or omission) significantly contributed to the child's death. The *Nichols* Court applied the significant cause test of but-for causation in the context of a medical neglect child abuse prosecution, and stated that the jury must determine "that medical neglect was at least a significant cause of [the victim's] death." *Nichols,* 2016-NMSC-001, ¶ 40. The *Nichols* Court held the phrase "resulted in" to include "a significant cause." *Id.* In this case, the majority holds that the phrase "resulted in" includes "but-for cause" and simultaneously reads "significant cause" out of "resulted in." *See maj. op.* ¶¶ 30, 38. This demonstrates the insufficiency of the instruction. In holding that there was insufficient evidence in this case, the majority essentially holds that "resulted in" and "but-for cause" are synonymous, but "resulted in" and "significant cause" are not. This is why being satisfied with "resulted in" is so dangerous and providing UJI 14-251 is so crucial. Defining a cause of death as "an act which, in a natural and continuous chain of events, produces the death," refines the concept of but-for causation and "incorporates the notion of proximate cause and instructs the jury not to convict the defendant if he is only at fault to an insignificant extent." *Simpson*, 1993-NMSC-073, ¶¶ 11, 13.

**{79}**  In closing argument, defense counsel conceded that but-for the failure to seek medical attention Isaac's chances of living were extinguished. The failure naturally resulted in Isaac's death. Yet, defense counsel shifted focus and argued that this failure was insignificant, "[W]hat you heard is that there was a 70 to 93 percent chance that this child was going to die anyway. . . . [W]hen you look at it . . . [,] 93 percent, not his fault." In other words, Defendant's neglect was too insignificant to hold him criminally liable. I

---

instruction, and the district court was so confused about proximate cause it added its own instruction, that also misapplied the standard. *See Montoya*, 2003-NMSC-004, ¶ 19.

cannot see how a reasonable juror could have parsed the causation question without further instruction. The majority declined to review this issue because it determined that insufficient evidence supported Defendant's conviction, and therefore, retrial was barred. However, I do not agree and so now turn to whether Defendant's conviction was supported by sufficient evidence. Because I would answer that question affirmatively, I would reverse and remand for a new trial.

## 2.    The confusion created by not defining medical neglect

**{80}**    I note that the confusion created by this instruction is not limited to the problem with causation. Additionally, the jury instructions did not describe any conduct or course of conduct that the jury could find was medical neglect. The State simply defined the "conduct" as "caused medical neglect." This is not conduct and is maddeningly circular. See UJI 14-623 (requiring the district court to "*describe [the] conduct or course of conduct alleged to have been child abuse*" in element 1). The jury was left to ponder what conduct constituted medical neglect, when this Court has stated:

> Jurors should not be left free, let alone encouraged by the prosecutor, each to go his or her own way when it comes to determining what criminal conduct—if more than one act is alleged—caused the child's harm. The jury needs to agree unanimously on what conduct caused harm to the child.

*Consaul*, 2014-NMSC-030, ¶ 25.

**{81}**    Although Defendant's desire to avoid discovery by authorities, his ineffective acts in response to an injured child, and his general failure to seek immediate medical attention may have been puzzled out by the jury in the context of trial, the conduct at issue was not identified. The problem of discerning the culpable conduct was compounded by the fact that the district court did not define medical neglect. Instead, the district court let Dr. Nienow define medical neglect as the term is used in the *medical* field: "Medical neglect means that it's a failure of a caregiver to provide appropriate medical treatment that could subsequently lead to significant harm or potentially death. . . . [N]ot providing appropriate medical treatment for an injury or a medical disease is medical neglect." This definition is less stringent than the legal definition suggested by *Nichols*, 2016-NMSC-001, ¶ 34 ("defining 'medical neglect' as '[f]ailure to provide medical, dental, or psychiatric care that is necessary to prevent or to treat serious physical or emotional injury or illness'" (quoting *Black's Law Dictionary* 1196 (10th ed. 2014)).

**{82}**    Regardless of these other errors, what concerns me most is the failure to adequately instruct on proximate cause, when the jury was required to determine whether Defendant's failure to seek medical attention was a significant cause of death. *See Nichols*, 2016-NMSC-001, ¶ 40; *Montoya*, 2003-NMSC-004, ¶ 19; *Simpson*, 1993-NMSC-073, ¶ 14. I turn now to why I must disagree with the majority's sufficiency of the evidence analysis.

## II.     SUFFICIENT EVIDENCE SUPPORTS DEFENDANT'S CONVICTION FOR CHILD ABUSE

{83}     The majority reverses Defendant's conviction for intentional child abuse resulting in the death of a child under the age of twelve by endangerment, because "if a defendant removes only a possibility of survival, one cannot logically say that, but for the defendant's conduct, the victim would not have died." *Maj. op.* ¶ 42. To reach this conclusion, the majority disregards the fact that under *Nichols*, "resulted in" includes the significant chance test for but-for cause (causation-in-fact), and effectively disregards the fact that a defendant may be a but-for cause by hastening a victim's death so that it occurs "when and how" it does. *See maj. op.* ¶ 40; *see also Nichols*, 2016-NMSC-001, ¶ 40 (observing that "the State was required to put forth substantial evidence that [the] neglect 'resulted in' [the] death . . . that medical neglect was at least a significant cause of . . . death"); *Montoya*, 2003-NMSC-004, ¶ 19 ("[A] defendant is a but for cause of death if the death would not have occurred *at the time it did and in the manner it did* but for defendant's actions." (emphasis added)). The majority tacitly acknowledges that the State established the factual basis of the crime, including that medical neglect occurred and that it was intentional and only takes issue with the evidence supporting one element, but-for causation (causation-in-fact). *Maj. op.* ¶ 42. The majority thus determines that there was insufficient evidence to support the determination that Defendant's conduct "resulted in" Isaac's death, and double jeopardy bars retrial. *Maj. op.* ¶ 3; *see also Dowling*, 2011-NMSC-016, ¶ 18. Respectfully, I disagree. Although Defendant had a duty, the opportunity, and the ability to do so, Defendant did nothing to save Isaac. There was sufficient evidence through both witness and medical expert testimony that Defendant's conduct "resulted in" Isaac's death.

### A.     Standard of Review: Sufficiency of Evidence

{84}     I would hold that the jury was erroneously instructed. The majority does not. Regardless, case law instructs that we nonetheless apply the same standard to review the sufficiency of the evidence. This Court reviews a defendant's claim of insufficient evidence "under the [] instruction provided to the jury at trial," to determine if retrial is barred by double jeopardy protections. *Dowling*, 2011-NMSC-016, ¶ 18.

{85}     "Evidence is viewed in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (internal quotation marks and citation omitted). This Court has also "made clear that because an appellate tribunal does not enjoy the same exposure to the evidence and witnesses as the jury at trial, our review for sufficiency of the evidence is deferential to the jury's findings." *Id.* (alteration omitted) (internal quotation marks and citation omitted). "So long as a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted).

**B.    The State Put Forth Sufficient Evidence**

**{86}**    Isaac's mother testified that she had been expecting Defendant and Portillo (who had been watching him the last few days) to bring Isaac home on the evening of March 24, 2015, (according to a phone call around dinner time) but even though they said they were bringing him, they did not. She did not hear from them until the early morning hours of March 25, after Isaac had experienced a significant blunt-head trauma, which ultimately produced a cascade of symptoms that resulted in his death. There were different theories of how Isaac received the primary injury, his significant head trauma. However, even if we accept Defendant's explanation, there is still sufficient evidence to support a conviction.

**{87}**    To explain the blunt-head trauma Defendant testified that he went to sleep around two in the morning on March 25, 2015, and "was awakened by [a] crash . . . of someone falling." Defendant explained that Isaac had fallen between the night stand and his bed. Defendant thought that "he had hit his head hard." He picked Isaac up and put him on the bed; Isaac was not crying, "[h]e seemed dazed, confused[,] . . . [h]is eyes were open, and then he would fall back asleep and he would close his eyes." Defendant and Portillo took Isaac to the bathroom to splash water on his face, but then Defendant left Isaac with Portillo to get ready to go back to bed. Defendant was "freaked out," but testified that he called Isaac's mother who told him to bring Isaac to her. That phone call occurred around 4:35 in the morning.

**{88}**    The jury made a determination of Defendant's credibility, including his inconsistent statements to police. Defendant's versions of the facts changed more than once. One time, he said that Isaac rolled off the bed and hit the table. Another time, he said Isaac hit the floor. One time, he said that he immediately took Isaac to Vargas. Another time, he said that he put Isaac on the bed. Yet another time, he said that before he took Isaac to Vargas he gave him a bath. The timeline of the evening was presented to the jury through the perspectives of the witnesses. The jury could have reasonably concluded that the original injury was survivable without delay, but-for Defendant's conduct. There was evidence that Defendant's primary concern was avoiding discovery by law enforcement, and this motivated his conduct, which delayed medical attention for the injury until it foreclosed the chance Isaac would survive.

**{89}**    When Defendant dropped off Isaac, Defendant told Vargas "he's lifeless, and I don't know what to do[,] . . . [j]ust don't tell the cops that we had the baby, because if you tell the cops, they're going to call [Children, Youth & Families Department] on you," and he left.

**{90}**    What is critical in the eventual causation analysis, is that Isaac did not succumb immediately to the trauma. From the moment of impact that caused the injury, blunt-head trauma, Isaac's brain began to swell, which caused a disruption and a lack of oxygen to Isaac's brain over time. Ultimately, this continually increasing lack of oxygen killed Isaac. *See maj. op.* ¶ 13-14. Defendant clearly knew Isaac was injured. *See maj. op.* ¶ 10. Dr. Nienow testified that Defendant's actions to "revive" Isaac by shaking or splashing water on him, are never an effective or appropriate medical treatment for a

loss of consciousness. Finally, it was clear Defendant's most urgent concern was avoiding the notice of authorities who might question where Isaac was when he was injured.

{91} Even if we presume that the jury did not rely on evidence that the injury occurred before Isaac "hit his head" when he fell out of bed, Defendant's testimony entitles the jury to infer that Defendant was immediately aware of Isaac's head injury and knew that Isaac needed medical attention but chose not seek medical attention for Isaac. *See State v. Garcia*, 2016-NMSC-034, ¶ 15.

{92} Dr. Hallstrom, a neuroradiologist, looked at images taken after Isaac reached the hospital and determined that Isaac was suffering from a subdural hemorrhage, bleeding inside his skull that increased the pressure on his brain and affected the ability of his heart and lungs to deliver oxygen to the brain. By the time the test was taken, Isaac was suffering from "global hypoxic ischemia," oxygen deprivation; and Dr. Hallstrom testified that the delay in medical care affects, and ultimately determines, whether the injury is survivable, produces permanent brain damage, or results in death.

{93} Dr. Nienow, a child abuse pediatrician, testified, according to the medical history she received, that by the time the ambulance arrived to transport Isaac to the hospital, Isaac was "unresponsive," had a "very poor neurological exam," and was experiencing "agonal breathing . . . kind of like end-of-life breathing" that was "very ineffective . . . and very infrequent." When asked how to "stop the progression of [oxygen deprivation]," Dr. Nienow responded, "the best way . . . is to get the kid oxygen[,] . . . [a]s soon as possible," which the emergency medical technicians (EMTs) did while they transported Isaac, whose oxygen level went up to one hundred percent while his breath was being assisted. While at the hospital, Isaac regained consciousness, but his condition continued to deteriorate, because he had significant brain trauma. Dr. Nienow stated that in her experience the described circumstances of Isaac's injury would not typically result in injuries that she observed.

{94} When asked about the length of time it takes for the "cascade of horrible" to occur, from the time the trauma occurs to death, Dr. Neinow testified that it depends on the severity of the trauma, which in this case, she understood to be pretty severe. She continued, "you cannot go without oxygen to your brain . . . for more than six minutes [without permanent damage]," and that the time it takes for a person suffering from oxygen deprivation *to receive treatment is crucial to their survival*. Dr. Nienow concluded that by "the time [EMTs] arrived[,] . . . the deed was done."

{95} In this case, based on the medical testimony, the jury was entitled to reasonably infer that during the time period *before* the deed was done, before the EMTs arrived, the injury was survivable, or at least, if medical attention had been sought, Isaac would have had a significantly greater chance of surviving. *See Nichols*, 2016-NMSC-001, ¶ 40; *Montoya*, 2003-NMSC-004, ¶ 19. This is precisely the type of testimony that the *Nichols* Court determined was absent, which could have proved that the victim had a significantly greater chance of recovery, "an appreciably better chance of survival." *Nichols*, 2016-NMSC-001, ¶¶ 40, 43 (opining that if the medical experts had testified

"that two hours, one hour, or even twenty minutes would have made a material difference in [the victim's] chance of survival, then the jury would have had some factual basis for its decision to convict").

{96}    Dr. Nienow opined that although she had seen nonmedical professionals place children in showers to try to revive them, "[i]t's never effective." Rather she stated directly, "[t]here is a *very real possibility* that had [Isaac] presented for immediate medical attention after the initial neurologic insult he would still be alive. There are *plenty* of children who have traumatic brain injuries, both accidental and non-accidental, who, given immediate medical attention, survive those injuries." (Emphasis added.) It is also significant that Dr. Nienow testified that what was concerning was the "extended length of time in which [Isaac could not] be revived where no medical attention was sought." In her opinion, although caregivers may understandably "freak out[,] . . . [t]hey're not going to allow" a child to remain unresponsive for "minutes, upon minutes, upon minutes [without seeking medical assistance]." When asked whether the delay in seeking medical attention "foreclosed the possibility" of survival, Dr. Nienow answered with certainty, "It took away that possibility, yes."

{97}    The jury properly determined the credibility of the various witnesses and reviewed all of the timelines presented by the various parties. Based on the evidence presented to the jury, I cannot say that a rational jury could not have found the essential facts necessary to determine that Defendant's medical neglect resulted in Isaac's death. I would not upset the jury's conclusion. *See Garcia*, 2011-NMSC-003, ¶ 5.

## III.    ISSUES WITH THE MAJORITY'S NEW TEST

{98}    Instead, of giving deference to the factfinder and indulging reasonable inferences that Defendant intentionally took Isaac on a circuitous path away from, rather than toward, medical attention in an effort to evade discovery, the majority announces a new standard for satisfying causation. The new standard requires that the state produce medical expert testimony that "to a reasonable degree of medical certainty that [the victim] would have lived with earlier medical intervention." *Maj. op.* ¶ 14. By requiring a showing that the victim "would have lived," if medical care was provided, the majority creates a standard that the neglect must be *the sole cause* of death. This elevated causation requirement overrules prior case law, announces a new standard, and retroactively applies it.

{99}    Further, requiring a medical expert to opine—to "a reasonable degree of medical certainty"—that but-for the failure to seek medical attention a victim would not have died conflates the standard of expert reliability with the standard of proof. Most significantly, it also ignores the *Nichols* requirement that the state only needs to show the victim had a significantly greater chance of living.

## A.    The "Would Have Lived" Standard

{100}    Since the injury or illness that causes death is always a concurrent cause of death in a prosecution premised on medical neglect, the jury is required to determine

that the omission or failure to act was a significant cause of the victim's death. *See Nichols*, 2016-NMSC-001, ¶ 40; *Montoya*, 2003-NMSC-004, ¶ 19. This is consistent with *Simpson*, which reviewed the causation requirements under the vehicular homicide statute and determined that that a defendant's culpable act cannot be an insignificant cause of the victim's death, even if it may be a but-for cause. *See Simpson,* 1993-NMSC-073, ¶¶ 13-14.

**{101}** The majority's "would have lived" standard negates the "significant cause" standard and elevates the quantum of proof required by our case law. I believe it sets an unachievable evidentiary standard. The possibility that a defendant is culpable because the identified conduct is a significant cause of death is carved out, and a defendant must now be the sole cause of death. This majority fails to justify this departure from precedent. *See State v. Montoya,* 2013-NMSC-020, ¶ 40, 306 P.3d 426 ("When deciding whether to overrule our own precedents, this Court considers such common-sense factors as whether the precedent is a remnant of abandoned doctrine, whether the precedent has proved to be unworkable, whether changing circumstances have deprived the precedent of its original justification, and the extent to which parties relying on the precedent would suffer hardship from its overruling." (internal quotation marks and citation omitted)).

**{102}** The standard announced today, that a defendant cannot "be liable for [a] victim's death [if] he would have probably died anyway," has been rejected. *See Montoya*, 2003-NMSC-004, ¶ 19 ("[W]here death results from multiple causes, an individual may be a legal cause of death even though other significant causes significantly contributed to the cause of death. Thus, even if the victim is at death's door, a defendant is liable for the victim's death if his act hastens the victim's death. (internal quotation marks omitted)); *State v. Munoz*, 1998-NMSC-041, ¶¶ 20-22, 126 N.M. 371, 970 P.2d 143 (holding that under the vehicular homicide statute a "cause of death [is] an act which, *in a natural and continuous chain of events*, produces the death [unless the defendant] is only at fault to an insignificant extent"). I note that the *Munoz* Court declined "to speculate what percentage of fault is 'significant' or insignificant' because that determination is to be made by the jury." *Munoz*, 1998-NMSC-041, ¶¶ 20-22. "The jury need not ascertain a numerical percentage of fault; rather, its verdict is its answer to the question of whether the defendant was at fault to a significant extent." *Id.* ¶ 22.

**{103}** The majority however has decided to remove from the jury the decision of whether a cause was a significant cause. It does so by disregarding evidence, which under *Nichols* would be sufficient to establish when "intervention would have been necessary to save [the victim] or give him an appreciably better chance of survival." *See Nichols*, 2013-NMSC-001, ¶ 43; *see also maj. op.* ¶¶ 31, 40. This case is factually more like *Montoya* where the evidence established that failure to timely provide medical care foreclosed the possibility that the victim would survive. Regardless, this case does not suffer the evidentiary deficiencies identified by *Nichols*.

**{104}** When asked whether the delay in seeking medical attention "foreclosed the possibility" of survival, Dr. Nienow answered with certainty, "It took away that possibility, yes." I cannot say that the jury did not reasonably conclude, based on the medical

testimony, that the injury, as it progressed from trauma to brain swelling, caused an increasing deprivation of oxygen to the point that ultimately, by the time Isaac was seen by medical professionals, his opportunity to survive had been foreclosed. Asked whether a child who has this type of head trauma, with the accompanying cascade of systemic problems, would survive without medical attention, Dr. Nienow replied no. Thus, if you find a child in Isaac's condition and you do nothing will that child die? Yes.[4]

{105}  A reasonable jury could have concluded, based on the testimony presented, that Isaac's life was not irretrievable when Defendant first had knowledge of the severity of the injury; Isaac could have survived. A reasonable jury could also have concluded that Defendant's conduct foreclosed that possibility. This evidence "raised the potential that the victim might have been taken to the hospital and furthermore, that [d]efendant removed all hope of this option by kidnaping him, driving him away and leaving him to die." *Montoya*, 2003-NMSC-004, ¶ 28.

{106}  The majority attempts to limit the application of *Montoya* because that sufficiency review was done under erroneous instructions that misstated the requirements of proximate cause pursuant to UJI 14-251. *See maj. op.* ¶ 41. *Montoya's* discussion of UJI 14-251, regardless of how you view it, does render the analysis of the sufficiency of the evidence of causation inapposite, particularly because but-for cause is still required. *Montoya* is directly on point because it establishes: (1) the jury should be given a proper proximate cause instruction, such as UJI 14-251; (2) the state is not required to prove the victim would have survived with medical intervention for a defendant to be culpable; and (3) the district court was incorrect when it stated that the state did not need to prove but-for causation. *Montoya* establishes that if A shoots B, and C drives B around instead of taking him to the hospital, C is culpable as *a* but-for cause of death; the law does not require that C be *the* but-for cause of death. C is culpable if the state establishes that B had a "significantly greater chance of living," even if B is at death's door. A medical expert does not need to testify that original injury is absolutely survivable if medical intervention had been provided. The facts must simply prove the victim's life was not irretrievable at the time of the direct injury. In fact, the majority disregards the causation standard applied by *Nichols* and the testimony therein specified to meet the sufficiency standard, that there was a period of time when Isaac was in Defendant's care, that Isaac's life was not irretrievable and medical intervention would have given Isaac a significantly greater chance of survival. Therefore, I cannot agree with the majority's standard, which is tantamount to holding that no reasonable juror could have found that

---

[4]The questioning of the medical expert in *Montoya* is strikingly similar:

> Q: . . . in your opinion do you think it is more likely that he would have survived. Or more likely that he would have died anyway if he had been taken straight to the hospital?
> A: I think it was still more likely that he would have died even if he would have been taken to the hospital.
> Q: Okay, But, again, I gather you agree that being taken away from a hospital guaranteed his death?
> A: Yes. Without medical treatment the wounds that were inflicted upon him would have resulted in his death.

*Montoya*, 2003-NMSC-004, ¶ 27.

Isaac had a chance of living, even if he had received immediate, appropriate medical attention.

## B.     The Reasonable Degree of Medical Certainty Standard

**{107}** In addition, the majority also holds that medical experts must testify "to a reasonable degree of medical certainty that Isaac would have lived with earlier medical attention." *Maj. op.* ¶ 35. As the Third Circuit has explained that "the phrase 'with a reasonable degree of medical certainty' is a useful shorthand" to the extent that it expresses "some basis for both the confidence with which [an expert's] conclusion is formed, and the probability that [the expert's] conclusion is accurate." *Schulz v. Celotex Corp.*, 942 F.2d 204, 208 (3d Cir. 1991) (internal quotation marks and citation omitted). "To that extent . . . [the phrase] is helpful in forestalling challenge to the admissibility of expert testimony." *Id.* However, the Third Circuit cautions that (1) courts should be wary of requiring the "incantation" of the shorthand and (2) using "the failure to voice it . . . as a basis" for excluding expert testimony without actually analyzing the "testimony itself." *Id.*

**{108}** The phrase "to a reasonable degree of medical certainty" should not be a prerequisite for establishing causation. Although doctors or medical experts may use "phrases like 'to a reasonable medical probability' or 'to a reasonable medical certainty,' [these] phrases [only] demonstrate a sufficient degree of conviction to be probative," and are "terms of art in the law that have no analog for a practicing physician." *Consaul*, 2014-NMSC-030, ¶ 69 (citing John B. Wong, et al., Federal Judicial Center, *Reference Manual on Scientific, Evidence, Reference Guide on Medical Testimony*, 691, 693 (3rd ed. 2011)). The term simply satisfies a "minimal standard of . . . admissibility, that an opinion is more likely than not true." *Id.* As such, I do not see that requiring the medical expert to use the phrase is meaningful after the testimony has been deemed admissible. Reviewing the record, the medical experts clearly offered their opinions with conviction that the opinions were more than likely accurate based on their expertise, which is all that is required.

**{109}** Requiring a medical expert to testify *to a reasonable degree of medical certainty* that a victim would have lived "would seriously mislead the jury as to the nature of the expertise involved" and impinge upon the ultimate question of the significance of the act or omission as a cause of death. *Cf. United States v. Glynn*, 578 F. Supp. 2d 567, 574-75 (S.D.N.Y. 2008) (precluding a ballistics expert from testifying to "a reasonable degree of . . . certainty" because it would mislead the jury and limiting testimony to terms similar to "more likely than not"). Medicine is not directed toward accurately calculating the probability of survival based on an unknown universe of knowable variables, which is what the majority's standard suggests—that medicine makes it possible to calculate survivability with a degree of certainty. The question of whether a cause is a significant cause of death is properly left to the jury. *Munoz*, 1998-NMSC-041, ¶¶ 20-22.

**{110}** The jury also was presented evidence that Defendant did what the defendant in *Montoya* did, neither took a step toward actually getting the injured victim necessary

medical attention. If a parent or person who has a duty to care for a child does nothing when they recognize that the child has a severe injury, it is not speculative to infer that the child's opportunity to obtain medical care is foreclosed. Here medical testimony established that doing nothing "certainly" foreclosed the chance to live. The question the majority demands—"Would Isaac have lived with certainty?"—is not the standard. It was not the requirement of *Montoya*, and this evolution will bear dire consequences on criminal prosecution of child abuse resulting in death due to neglect. It is necessary at this point to apply common sense. A lawyer understands that asking the question "To a reasonable degree of medical certainty would the victim have lived without medical intervention?" is intended to establish the significance of the failure to provide medical care. However a doctor hearing that question will view it not as a matter of statistics or probability but one of medicine and thus find it impossible to answer. Our case law does not require such medical certainty; it only requires that a defendant be shown to foreclose any chance of survival by not seeking medical attention. Reexamining *Montoya* in light of the majority's new rule shows the consequence of this new requirement. In *Montoya*, the state would find it difficult to find an expert to opine that a victim shot in the head "would have survived the gunshot wound to a reasonable degree of medical certainty," if the Defendant had taken him to the hospital and not left him in the car. Yet, this is what the majority now demands.

## C.    Additional Consequences of the Majority's Holding

**{111}**  I am also concerned that the opinion will create a number of perverse incentives. First, it appears to incentivize an abuser to deny a victim medical care. In the absence of any medical care, the question of when any injury would have been survivable (and at what point the injury was certainly fatal) becomes more difficult, if not impossible, to answer with any degree of certainty. We do not allow such an outcome in the civil context, and it seems more abhorrent in the context of abuse of a child. *See Alberts v. Schultz*, 1999-NMSC-015, ¶ 30, 126 N.M. 807, 975 P.2d 1279 ("[T]he physician should not be able to avoid liability on the ground that it is uncertain what that outcome would have been." (internal quotation marks and citation omitted)). The best way an abuser can avoid proof that it is "a certainty" a child would have lived, is to ensure that he or she does not by foreclosing any medical response. The more traumatic the original act the less likely the state will prove that with medical care the victim would have lived.

**{112}**  Second, I do not believe that the majority's heightened standard is necessarily limited to medical neglect, child abuse cases, and so it is absolutely unclear to what degree the majority is changing precedent without providing any justification for overruling, abrogating, or unsettling what has been a settled standard in concurrent-actor criminal prosecutions based on medical neglect such as *Montoya*. *See State v. Montoya,* 2013-NMSC-020, ¶ 40 (stating some commonsense factors that this Court considers before deciding to disturb settled precedent).

## IV.    CONCLUSION

**{113}**  Applying the proper deferential standard of review, I would hold that, based on the instructions given, sufficient evidence supported Defendant's conviction of child

abuse resulting in the death of a child. However, since I believe that the district court's instruction on causation constituted reversible error, I would remand for retrial on this charge, but I agree with the majority's reasoning and conclusion that Defendant's conviction of conspiracy to commit child abuse should be vacated.

**DAVID K. THOMSON, Justice**