The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: April 21, 2025

**NO. S-1-SC-39283**

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**DEBORAH GREEN,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**James Lawrence Sanchez, District Judge**

Raúl Torrez, Attorney General
Laurie Blevins, Assistant Attorney General
Felicity Strachan, Assistant Attorney General
Santa Fe, NM

for Appellant

Harrison & Hart, LLC
Carter B. Harrison IV
Nicholas T. Hart
Albuquerque, NM

for Appellee

**OPINION**

**BACON, Justice.**

{1}     The State appeals from a decision of the district court granting Defendant Deborah Green's petition for habeas corpus pursuant to Rule 5-802 NMRA. *See also* Rule 12-501 NMRA. In *Montoya v. Ulibarri*, we held the protections afforded by the New Mexico Constitution allow a defendant to obtain habeas relief based on a freestanding claim of actual innocence, independent of any constitutional violation at trial. 2007-NMSC-035, ¶ 1, 142 N.M. 89, 163 P.3d 476. This case presents the issue of whether such protections apply when a prisoner is convicted by way of a plea agreement. With *Montoya* as our touchstone, we hold Defendant was entitled to assert a freestanding claim of actual innocence following her conviction by plea. However, we also hold the district court's finding of actual innocence was not supported by substantial evidence. Accordingly, we reverse the district court's grant of Defendant's petition for writ of habeas corpus and remand for proceedings consistent with this opinion.

**I.      FACTUAL BACKGROUND**

{2}     The grisly facts developed at the habeas hearing are disquieting, to say the least. Defendant was the co-leader of a religious organization known as the Aggressive Christian Missionary Training Corps (Corps). Considered by the Corps's

members to be a "prophetess" and an "Oracle of God," Defendant had nearly complete control over her disciples' lives, including driving, finances, and the authority to make all manner of decisions affecting the children who lived at the compound in a remote and rural area of Cibola County, New Mexico. Defendant also required members to cut off ties with their families. The children at the compound did not have birth certificates, were not immunized, and were not permitted to attend outside schools. Under Defendant's close watch, medical treatments at the compound were generally confined solely to those permitted by Defendant, with access to outside professional medical care rigidly controlled.

{3}     The genesis of the tragic events that gave rise to the charges in this case dates back to sometime in late 2013 when most of the compound's residents came down with the flu. One of those residents, and the victim in this case, was a twelve-year-old child, E.M., who lived at the compound with his mother. Although the other residents recovered from their ailments in due course, E.M.'s symptoms persisted and worsened, becoming more severe when Defendant prohibited E.M. from eating for several days as punishment for his illness-related absences from the Corps's regularly scheduled communal meals. The right side of E.M.'s body eventually became paralyzed, he went blind in his right eye, he lost the ability to speak or

swallow, and he experienced seizures—all before he succumbed to his illness in mid-January 2014.

{4}     Neither Defendant nor anyone else timely reported E.M.'s death to the proper authorities. Police first came to learn of his passing some two years later, in January 2016, when two other Corps members informed the police of E.M.'s death and sought help to "escape" from the Corps's compound. Police secured a warrant to exhume E.M.'s body and the ensuing autopsy determined that the child's cause of death was a "probable infectious disease." However, the autopsy report stopped short of identifying "the exact cause of [E.M.'s] infection" due to the "advanced decomposition" of the soft tissues of his body.

{5}     We end our factual summary of the case by recognizing the aphorism that "[a] cult is a religion with no political power." James D. Tabor & Eugene V. Gallagher, *Epigraph* to *Why Waco? Cults and the Battle for Religious Freedom in America* vii (1995). Whatever truth lies in this saying, the habeas hearing evidence below showed that the Corps as headed by Defendant was decidedly less a religion and more of a cult in the sense it was "a deviant, fanatical group led by a charismatic person who postures as a religious leader but who is in fact a self-serving individual who beguiles people into following him or her, and who manipulates and uses them for his or her own purposes." Scott M. Lenhart, *Hammering Down Nails: The Freedom of Fringe*

3

*Religious Groups in Japan and the United States—Aum Shinrikyō and the Branch Davidians*, 29 Ga. J. Int'l & Compar. L. 491, 495 (2001) (internal quotation marks and citation omitted). Either way, the Corps clearly was not the wholesome, "disciplined, prayer-focused commun[ity]" Defendant portrayed it to have been in her habeas petition.

## II.    PROCEDURAL BACKGROUND

{6}    The facts relating to E.M.'s suffering and demise were by no means the only source of potential criminal liability faced by Defendant in the underlying indictment. Also included in the indictment were a series of kidnappings, criminal sexual penetration of a minor, and child abuse counts relating to a young girl referred to in the record as M.G., who had lived in the Corps's compound until she was removed by state authorities based on concerns that she "was malnourished and suffered from rickets."[1] After the charges relating to M.G. were severed from those relating to E.M., a jury convicted Defendant of seven of the M.G.-related charges. Defendant was sentenced to a 72-year prison term in relation to those crimes in September 2018. Three weeks later, Defendant entered into a plea agreement for the

___

[1]A state investigation revealed that M.G., although held out as Defendant's granddaughter, was not in fact related to Defendant and was brought out of Uganda by Defendant's adult daughter.

4

case at hand, and pled no contest to, among other charges, one count of child abuse resulting in great bodily harm to E.M. Pursuant to the plea, she was sentenced to a prison term of 18 years, to run concurrent with the 72-year sentence from the M.G.-related conviction.

{7}     More than two years later, in November 2020, Defendant's convictions for the M.G.-related crimes were set aside as a result of a *Brady* violation by the State, *see Brady v. Maryland*, 373 U.S. 83 (1963), and a new trial on those charges was ordered. In lieu of retrial, the State dismissed the M.G.-related charges outright, "due to [the] unavailability of essential witnesses."

{8}     On the heels of the *Brady*-based dismissal of the M.G. charges, Defendant filed the underlying habeas petition arguing, first and foremost, that the taint of the *Brady* violation found in connection with the charges related to M.G. somehow extended to the previously severed E.M.-related charges as well. The district court rejected that argument—properly it would appear—concluding as a matter of law that the *Brady* violation that tainted the prosecution related to M.G. provided no basis to invalidate the plea deal reached in E.M.'s case because the two matters involved "a different alleged victim, different witnesses, different theories, different evidence, and the evidence underlying the *Brady* violation on the [M.G.] case was not probative of any of the issues related to the plea in [the E.M.] case." The district

court's *Brady*-related habeas ruling, aside from its importance as a historical fact, is not otherwise implicated in this appeal.

{9}     Defendant's habeas petition sought to vacate her E.M.-related plea on three additional grounds: (1) that "the bare-bones factual basis" for the child abuse charge set out in Defendant's underlying plea colloquy was "inadequate as a matter of law"; (2) that Defendant was "actually innocent" of any child abuse crime because her conduct did "not meet [the operative] statutory elements"; and (3) that Defendant received ineffective assistance of trial counsel (IAC). The district court rejected Defendant's challenge to the sufficiency of the plea colloquy and her IAC claim, and those issues are not implicated in this appeal.

{10}     But Defendant's actual innocence claim secured a foothold in the district court despite the absence of any proffer of new factual evidence to support her habeas claim. Following a four-day hearing in January 2022 that showcased competing expert testimony on the issues of medical neglect and causation, the district court granted Defendant's habeas petition based on her legal assertion of actual innocence. In doing so, the district court found as fact that Defendant, who served as E.M.'s "custodian" and "exercised extreme control over the child's life and welfare, . . . failed to seek medical attention for the child in a timely manner, and [thus] *cause[d] the child's condition to worsen*." (Emphasis added.) Despite this explicit factual

finding, the district court granted Defendant full habeas relief, concluding—without analysis or citation to authority—that conduct causing a child's medical condition to worsen does not constitute "great bodily harm justifying a first degree felony charge, as a matter of law." As a result, the district court set aside Defendant's plea, dismissed the E.M.-related child abuse charge covered in the plea agreement, and released Defendant from custody.

{11} The State now appeals to this Court as of right. *See* Rule 5-802(N)(1) (authorizing the state to appeal an order granting a writ of habeas corpus); Rule 12-102(A)(3) NMRA (requiring that "appeals from the granting of writs of habeas corpus" be taken to this Court).

## III. DISCUSSION

{12} When reviewing the propriety of a district court's grant or denial of a writ of habeas corpus, we review questions of law and questions of mixed fact and law de novo, thus "assur[ing] that this Court maintains its role as arbiter of the law." *State v. Cates*, 2023-NMSC-001, ¶ 12, 523 P.3d 570 (citation omitted). However, questions relating to a district court's habeas-based findings of fact are subject to substantial evidence review. *Lukens v. Franco*, 2019-NMSC-002, ¶ 15, 433 P.3d 288. "Substantial evidence is evidence that a reasonable mind would regard as

adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

**A. A Freestanding Claim of Actual Innocence Is Properly Applied in the Context of Plea Bargains**

{13}    First, we determine whether the freestanding claim of actual innocence recognized by this Court in *Montoya*, 2007-NMSC-035, ¶ 24—a habeas appeal involving a conviction rendered after trial—is equally applicable in circumstances where, as here, the conviction under collateral attack is the product of a plea bargain. In *Montoya*, we held that a freestanding claim of actual innocence must be predicated upon discovery of new evidence. We further concluded that the petitioner making such a claim "must convince the court by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Id.* ¶ 30.

{14}    The State urges this Court to exclude from the reach of an actual innocence claim all plea convictions, pointing to its concern for finality that is a hallmark of the plea process.

{15}    Instructive in addressing this issue is *People v. Reed*, in which our colleagues on the Illinois Supreme Court determined that similar prosecution concerns over "the interests of finality and certainty involving guilty pleas" were insufficient to foreclose a defendant from advancing a freestanding claim of actual innocence. 2020 IL 124940, ¶¶ 41-42, 182 N.E.3d 64 (refusing "to turn a blind eye to the manifest

8

injustice and failure of our criminal justice system that would result from the continued incarceration of a demonstrably innocent person, even where a defendant pleads guilty"). Though not unsympathetic to the state's position, the *Reed* Court ultimately concluded that the "[s]tate's interests and policy concerns [were] more appropriately accounted for and protected by [adopting a stringent review] standard applicable to actual innocence claims involving defendants who plead guilty." *Id.* ¶¶ 42, 48. To that end, the *Reed* Court adopted its own variant of the clear and convincing standard that we employed in *Montoya* for evaluating "a successful actual innocence claim" in the plea context. *Reed*, 2020 IL 124940, ¶ 49. Through this measured approach, the *Reed* Court struck what it characterized as "an equitable balance between the defendant's constitutional liberty interest in remaining free of undeserved punishment and the [s]tate's interest in maintaining the finality and certainty of plea agreements, while vindicating the purpose of the criminal justice system to punish only the guilty." *Id.* ¶ 50.

{16} Following the lead of the Illinois Supreme Court in *Reed*, we also conclude the application of *Montoya*'s clear and convincing standard (like the "stringent" standard in *Reed*) in adjudging the merits of a defendant's actual innocence claim successfully threads the needle in accommodating all the competing and legitimate policy objectives identified above.

9

{17}    Further, and in accord with the *Reed* Court, we are not inclined to impose a legal barrier that prevents a defendant from advancing a freestanding claim of actual innocence when convicted by plea agreement. Two factors contribute to our reluctance to do so. First, nothing in *Montoya*—or the scant few cases that, along with *Montoya*, comprise our slowly developing actual innocence jurisprudence— affirmatively calls into question the prudence or propriety of applying the freestanding actual innocence doctrine in the realm of plea bargains. Viewed in this vacuum, the lofty constitutional considerations that informed the *Montoya* Court's adoption of the actual innocence doctrine in the trial context compel the application of the doctrine in the plea bargain setting as well. 2007-NMSC-035, ¶ 23 ("We conclude that the conviction, incarceration, or execution of an innocent person violates all notions of fundamental fairness implicit within the due process provision of our state constitution."); *id.* ¶ 24 ("[T]he incarceration of an innocent person [does not] advance[] any goal of punishment, and if a prisoner is actually innocent of the crime for which he is incarcerated, the punishment is indeed grossly out of proportion to the severity of the crime."). Aside from the finality concerns discussed above, the State has offered no sound basis to withhold from those defendants convicted by way of a plea the self-same constitutional protections *Montoya*

10

appropriately made available to defendants convicted after trial—and we perceive none.

{18} A contrary holding would needlessly depart from the sound view adopted by several state jurisdictions that have considered the issue. *See, e.g.*, *Schmidt v. State*, 909 N.W.2d 778, 783, 793-95 (Iowa 2018) (citing *Montoya* for the proposition that "actually innocent people should have an opportunity to prove their actual innocence," and extending that opportunity equally to Iowa defendants "regardless of whether [they] pled guilty or went to trial"); *Reed*, 2020 IL 124940, ¶¶ 33, 41 (pointing primarily to two characteristics of plea agreements—that they are neither "structured to weed out the innocent or guarantee the factual validity of the conviction" nor "more foolproof than full trials"—in concluding that "defendants who plead guilty may assert an actual innocence claim" (internal quotation marks and citations omitted)); *see also People v. Schneider*, 25 P.3d 755, 760 (Colo. 2001) (en banc) (pointing to the common practice of defendants to "choose to enter guilty pleas for reasons other than clear guilt" in rejecting the prosecution's argument "that a defendant who has entered a plea should not be entitled to postconviction relief in the face of newly discovered evidence," and branding that argument as one that fails to foster a "just and fair outcome").

{19} In all, the principal policy objective underlying a freestanding claim of actual innocence—to honor the constitutional imperative "prohibit[ing] the imprisonment of one who is innocent of the crime for which he was convicted" in order to further "the central purpose of [our] system of criminal justice[,] . . . to convict the guilty and free the innocent," *Herrera v. Collins*, 506 U.S. 390, 398 (1993)—applies with equal force to convictions obtained through plea agreements as it does to convictions after trial.

## B. Defendant's Actual Innocence Claim Lacks Merit and the District Court Erred in Concluding Otherwise

{20} Now that it has been established that a defendant who enters into a plea agreement is entitled to raise a defense of actual innocence, we look at the merits of Defendant's actual innocence claim. Defendant's actual innocence claim advances no new factual evidence. Instead, Defendant relies exclusively on a misguided legal argument to support her habeas claim, asserting that the *but-for* causation standard articulated by this Court in *State v. Garcia*, 2021-NMSC-019, ¶¶ 29-47, 488 P.3d 585—an opinion issued after Defendant's entry of her plea—"marks a sea change in medical-neglect causation law" that jettisons the lesser *significant cause* standard previously set out by this Court in *State v. Nichols*. *See* 2016-NMSC-001, ¶ 40, 363 P.3d 1187 (indicating that the state, in order to prevail on a theory of medical-neglect child abuse, must "put forth substantial evidence that . . . medical neglect was at least

12

a significant cause of [the child's] death or great bodily injury"). As Defendant frames the claim in her habeas petition, this supposed change in the law precludes the State from "adduc[ing] legally sufficient evidence—let alone a case that has any chance of actually *persuading* any juror—to prove any conceivable theory charged."

{21} Unfortunately for Defendant, the *Garcia* Court—by its own account—did not announce a new rule of medical-neglect causation law and instead merely honed and refined this Court's existing precedent in *Nichols*. This is made evident in several passages of the majority opinion in *Garcia*. *See* 2021-NMSC-019, ¶ 39 (emphasizing that the Court was merely "confirm[ing] . . . that causation in a criminal medical neglect case must include but-for causation and no less," and thus "adher[ing] to our long-established [but-for] standard," a "foundational criminal principle" that *Nichols* "did not abandon"); *id.* ¶ 40 (clarifying "that proof of causation under *Nichols* requires that the medical neglect be a factual, but-for cause of the child's death"); *id.* ¶ 43 (explaining that, in *Nichols*, "we affirmed the but-for causation requirement in cases of child abuse causing death, holding that evidence of possible causation is insufficient," and, in having done so, "are bound by the precedent established in *Nichols* and . . . follow that standard in this case" (citation omitted)).

{22} The observations made and the actions taken by the *Garcia* Court—*confirming*, *clarifying*, and *following* the precepts and holding of *Nichols*—hardly

13

bespeak the announcement of a new potentially retroactive rule of law. *See Rudolfo v. Steward*, 2023-NMSC-013, ¶ 9, 533 P.3d 728 (reiterating that an appellate "opinion announces a new rule [only] if it breaks new ground, imposes new obligations on the government, or was not dictated by precedent" (internal quotation marks and citation omitted)). That being so, *Garcia* does not represent an intervening change in the law that theoretically might provide a foundation for Defendant's actual innocence claim. *See Santillanes v. State*, 1993-NMSC-012, ¶ 36, 115 N.M. 215, 849 P.2d 358 ("It is within the inherent power of this Court to give its decision prospective or retroactive application without offending constitutional principles." (citation omitted)). In light of our conclusion that *Garcia* did not announce a new rule, Defendant is hard-pressed to explain how or why enforcement of the plea agreement as written would offend her due process rights or right to be free from cruel and unusual punishment as a result of her actual innocence.[2]

---

[2]In the procedural posture of this case and considering the fact that Defendant has not demonstrated a change in the law, we need not and do not decide the broader issue hinted at by the State's briefing: whether a change in law, standing alone and without newly presented evidence, ever can provide a valid basis for a freestanding claim of actual innocence in New Mexico. For our purposes, it is enough to acknowledge the dearth of state court case law supporting that premise. Indeed, research reveals only one reported state decision that has recognized the validity of a freestanding actual innocence claim in the absence of new evidence. We refer to *In re Lester*, 602 S.W.3d 469 (Tex. 2020), a wrongful-imprisonment compensation case. In *Lester*, the Texas Supreme Court concluded that the "outrageous" scenario there presented—involving a criminal defendant who pled guilty to conduct that did

{23}  In a separate but related vein, we emphasize that out-of-state jurisdictions that recognize freestanding actual innocence claims generally equate the concept of actual innocence with "factual innocence, not mere legal insufficiency of evidence of guilt." *People v. Fraser*, 84 N.Y.S.3d 553, 556 (N.Y. App. Div. 2018) (internal quotation marks and citation omitted); *accord Gould v. Comm'r of Corr.*, 22 A.3d 1196, 1206 (Conn. 2011) ("Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime."); *Turner v. Commonwealth*, 694 S.E.2d 251, 261 (Va. Ct. App. 2010) (stating that relief based on actual innocence is available "only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted and not those who merely produce evidence contrary to the evidence presented at their criminal trial" (internal quotation marks and citation omitted)); *see also Jardine v. State*, 556 P.3d 406, 419-21 (Haw. 2024) (interpreting the term *actual innocence*, as used in Hawaii's wrongful conviction

___

not constitute "a crime [when committed or] at any time during his criminal proceedings" because the charging statute had previously been declared unconstitutional—could only be viewed as involving a person who was "actually innocent in the same way that someone taking a stroll in the park is actually innocent of the crime of walking on a sidewalk. No such crime exists." *Id.* at 471-73.

compensation statute, to mean *factual innocence*). Reflecting this purely factual focus, the "prototypical example" of *actual innocence* offered by the United States Supreme Court is one "where the [s]tate has convicted the wrong person of the crime." *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), *superseded by statute on other grounds as stated in Atwood v. Shinn*, 36 F.4th 834, 837 (9th Cir. 2022).

{24}    Weighed against the narrow factual contours of the actual innocence doctrine, it is clear the district court's grant of habeas relief was error. From a procedural perspective, given Defendant's choice to confine her actual innocence claim to the *legal* assertion that her conduct as it related to E.M. did "not meet [the operative] statutory elements" of the charged child abuse crimes, it is questionable whether a *factual* hearing was warranted in the first instance. And substantively, the district court's express finding that Defendant's "fail[ure] to seek medical attention for [E.M.] in a timely manner . . . cause[d] the child's condition to worsen"—and, by logical extension, resulted in the great bodily injuries that E.M. undisputedly endured—was incompatible with a finding of actual innocence. Far from exonerative in nature, the district court's unchallenged causation finding directly implicated Defendant in the commission of the crime. *Montoya* requires a defendant to present new affirmative evidence of innocence, and further requires the defendant to persuade the district court by clear and convincing evidence that no reasonable

juror would have convicted them in light of the new evidence—a "rigorous" and "demanding" standard. 2007-NMSC-035, ¶ 29. Given the total lack of new affirmative evidence of innocence in this case, we hold substantial evidence does not support the district court's determination that Defendant satisfied *Montoya*'s actual innocence standard.

## IV.    CONCLUSION

{25}    For the foregoing reasons, we reverse the district court's grant of Defendant's petition for writ of habeas corpus and remand for proceedings consistent with this opinion.

{26}    **IT IS SO ORDERED.**

---

**C. SHANNON BACON, Justice**

**WE CONCUR:**

---

**MICHAEL E. VIGIL, Justice**

---

**JULIE J. VARGAS, Justice**

---

**BRIANA H. ZAMORA, Justice**

**DAVID K. THOMSON, Chief Justice, specially concurring**

17

**THOMSON, Chief Justice (specially concurring).**

{27} There should be no surprise in the argument advanced by Defendant in this habeas proceeding when, in my view, this Court created a different standard for causation for medical neglect claims in *State v. Garcia*, 2021-NMSC-019, ¶ 98, 488 P.3d 585 (Thomson, J., dissenting in part and concurring in part). While I concur in the reasoning and conclusion in this case, I had hoped the Court would revisit its departure from precedent in *Garcia*, specifically from the standard articulated in *State v. Nichols*, 2016-NMSC-001, ¶ 40, 363 P.3d 1187 ("[T]he State was required to put forth substantial evidence that [the defendant's] neglect resulted in [his son's] death or great bodily harm, meaning that medical neglect was at least a significant cause of his death or great bodily injury." (internal quotation marks and citation omitted)).

{28} In the dissent in *Garcia*, I expressed concerns that the "would have lived" standard adopted by the majority requires that the state produce medical expert testimony that, "to a reasonable degree of medical certainty[, the victim] would have lived with earlier medical intervention." *Garcia*, 2021-NMSC-019, ¶ 14; *id.* ¶ 60 (Thomson, J., dissenting in part and concurring in part). By requiring a showing that the victim "would have lived" if medical care was provided, the majority created a standard that the neglect must be the sole cause of death. "This elevated causation

requirement overrules prior case law, announces a new standard, and retroactively applies it." *Id.* ¶ 98 (Thomson, J., dissenting in part and concurring in part).

{29} The majority rebuts Defendant's arguments by asserting that "the *Garcia* Court—by its own account—did not announce a new rule of medical-neglect causation law and instead merely honed and refined this Court's existing precedent in *Nichols*." *Maj. op.* ¶ 21. Despite the majority's rhetorical self-assurance that the *Garcia* Court did nothing to change the but for standard in *Nichols*, this Defendant's position in the tragic death of E.M. belies another conclusion.

**DAVID K. THOMSON, Chief Justice**

19